**Michael P. TURNER, Petitioner,**

v.

**Michael V. FAIR, Respondent.**

**Civ. A. No. 77–1028–G.**

United States District Court,
D. Massachusetts.

Sept. 4, 1979.

Michael P. Turner, pro se.

Nelson Baker, Boston, Mass., for petitioner.

Robert V. Greco, Asst. Atty. Gen., Boston, Mass., for respondent.

## MEMORANDUM OPINION

GARRITY, District Judge.

The central issue presented by this petition for a writ of habeas corpus involves ascertaining the scope of a defendant's Sixth Amendment right to be confronted by the witnesses against him, a right that guarantees an opportunity for adequate cross-examination in both state and federal criminal proceedings. *Davis v. Alaska*, 1974, 415 U.S. 308, 315–316, 94 S.Ct. 1105, 39 L.Ed.2d 347. Specifically the question we face is whether in the circumstances of this case petitioner's Sixth Amendment right was abridged by the state trial court's action denying petitioner's motion to strike the direct testimony of crucial government witnesses at the same time as upholding those witnesses' assertion of their Fifth Amendment privilege in refusing to answer questions on cross-examination. We hold that the trial court did commit error of constitutional dimension, and we grant the writ of habeas corpus, conditionally.

Our analysis begins with a summary of the factual and procedural background. Following a trial in Norfolk Superior Court petitioner and his co-defendant brother were convicted of murder in the first degree, assault with intent to rob, unlawfully carrying a weapon, and using a motor vehicle without authority. Petitioner appealed his conviction to the Massachusetts Supreme Judicial Court, which affirmed the judgments in *Commonwealth v. Turner*, 1977 Mass.Adv.Sh. 173. He is now serving a sentence of life imprisonment at MCI, Walpole, for the murder conviction.[1] Petitioner's brother, Bruce Turner, died on September 9, 1976, and the cases against him thus terminated. *Turner, supra*, at 173, n. 1.

The evidence pertaining to the events leading up to petitioner's arrest, trial and subsequent conviction was summarized in the opinion of the Supreme Judicial Court, *Turner, supra*, at 174–76.

Two masked men entered the Cumberland Farms store on Bussey Street in Dedham about 7:20 *P.M.* on March 25,

---

1. Petitioner was also sentenced to not less than fifteen nor more than twenty years on the assault conviction, to be served at MCI, Walpole, on and after the life sentence imposed on the murder indictment. Trial Transcript, at 10–143. The trial court ordered the guilty verdicts on the last two indictments to be placed on file. Trial Transcript, at 10–144.

1974. One of the men wore a green mask. The taller of the two men was carrying a very long black gun, while the other was carrying a shorter gun. They pointed their guns at the cashier Thomas M. Connors (Connors), stated, "This is a robbery," and told him to open the safe. They ordered a customer, Walter Wilson, to get back, fatally shot him in the face and chest, and then fled.

The police found a .44 or .45 caliber bullet embedded in the floor of the store, and at the autopsy a .22 caliber and a .44 or .45 caliber bullet were removed from the victim's body.

On March 26, 1974, the police found a blue green 1970 Dodge automobile, reported stolen the day before, less than a mile from the scene of the shooting. A knotted green scarf with human bloodstains was found in the back seat.

As a result of promises of immunity from the Norfolk district attorney, and after having received a limited grant of immunity from this court, John F. Wallace (Wallace) and his stepbrother, James Thomas Evans (Evans), described the events surrounding the homicide and attempted robbery to the police, to the grand jury, and at the trial of the defendant.

Wallace testified that Evans, Bruce Turner, and Michael Turner had joined him at his apartment in South Boston on the afternoon of March 25, 1974, and talked about "pulling a robbery." Wallace and Evans said they saw two hand guns at the apartment: Bruce Turner had a .45 caliber and Michael Turner had a .22 caliber. Evans gave Bruce Turner a green V-shaped scarf, which belonged to Evans's girl friend who lived elsewhere in the same building.

The foursome, Wallace, Evans, and the two Turners, left the apartment early that evening and drove to Dedham in two cars. They parked one car and drove to the Cumberland Farms store in the other, a stolen blue green Dodge, which they parked around the corner from the store. The Turners got out of the Dodge, and went into the store. Shortly thereafter they ran back to the Dodge and ordered Wallace and Evans to drive away. Bruce Turner said, "We blew it. I had to shoot him." His finger was bleeding and he wrapped the green scarf around it. Wallace drove to where the other car had been parked. They all got out of the Dodge and drove away in the other car.

The four separated and met later the same evening at Wallace's apartment. Helen Lux, who shared the apartment, was also there. She testified that Michael Turner was "very nervous," that Bruce Turner unloaded a large gun and that Michael Turner unloaded a smaller gun. Two empty .45 shells and an empty .22 shell were placed in a cup in the cupboard. She gave Bruce a cloth for his finger, which was bleeding. There was further testimony tying the Turners to various weapons and ammunition and linking them to these crimes.

When Michael Turner was arrested in his home in May, 1974, an unloaded .38 caliber revolver was found in his shaving kit. After his arrest, he asked the police, "Which gun killed him?"

Both petitioner and his brother testified at the trial. Petitioner maintained that he was not present during the robbery at all and that Wallace and Evans, the guilty parties, sought to frame him in order to obtain immunity from prosecution.

Wallace and Evans testified before the grand jury which issued the indictments in this case under a formal grant of immunity obtained from Justice Quirico of the Massachusetts Supreme Judicial Court by the District Attorney pursuant to Mass.G.L. c. 233, §§ 20C–20G. The order required Wallace and Evans to "answer the questions before the grand jury for Norfolk County propounded to them and all further questions which may be propounded to them before such grand jury relating to the alleged attempted robbery of the Cumberland Farms store in Dedham, Massachusetts, on March 25, 1974, and the alleged murder of Walter Wilson," and further provided that Wallace and Evans "be and they hereby are granted immunity from prosecution with respect to

their testimony to the extent provided by G.L. c. 233, § 20G . . ..." *Turner, supra,* at 177, quoting from June 24, 1974 Order. Both parties agree that the formal immunity grant extended only to testimony relating to the March 25, 1974 attempted robbery and homicide.

In addition to formal immunity, John Wallace appears also to have been promised, in return for his cooperation, "consideration" with respect to any other crimes outstanding in Norfolk County, with the possible exception of an armed robbery at the Capitol Market for which he had been previously indicted. Trial Transcript, at 5-10, 12. Although this promise was reduced to writing, Trial Transcript, at 5-11, the term "consideration" itself was never defined. Trial Transcript, at 5-12.

During his grand jury appearance, Wallace mentioned having committed several past crimes, including an armed robbery in August 1973 of the same Cumberland Farms store involved in this case. Grand Jury Transcript, at 7, 10.[2] Evans also testified before the grand jury to having "held up" the same Dedham Cumberland Farms store in September 1973, Grand Jury Transcript, at 17.

At trial, petitioner sought to cross-examine these witnesses about the August and September 1973 robberies. The witnesses refused to answer any questions directed to these past crimes, asserting their Fifth Amendment privilege against self-incrimination. After extensive voir dire of John Wallace and discussion with counsel, the trial judge concluded that when he testified before the grand jury, Wallace was under the mistaken impression that he enjoyed immunity from prosecution for past crimes as well as for the March 25, 1974 attempted robbery and homicide and, therefore, that he did not knowingly and intelligently waive his privilege during grand jury testimony. The judge thus upheld Wallace's invocation of the Fifth Amendment at trial. Trial Transcript, at 4-133-135. He also denied petitioner's motion to strike Wallace's direct testimony. Trial Transcript, at 5-3. He did rule, however, that petitioner's counsel might read to the jury Wallace's testimony before the grand jury, including the references to the past crimes, provided that it be read in its entirety. Trial Transcript, at 5-15, 5-17-21. Defense counsel apparently chose not to do so.[3]

Regarding the witness James Evans, the matter appears to have been dealt with in a rather summary fashion. When he was questioned about past crimes during cross-examination, Evans also refused to answer. Without any inquiry into the circumstances surrounding Evans' purported waiver and without any voir dire of Evans, the trial court advised him that he had the right to invoke his Fifth Amendment privilege. Trial Transcript, at 6-21-24. Defense counsel noted his exception and indicated that his position was the same as that for Wallace. Trial Transcript, at 6-24.

On appeal to the Massachusetts Supreme Judicial Court, petitioner pressed four arguments: (1) that the trial court

2. The Massachusetts Supreme Judicial Court did not have access to the grand jury testimony because the transcript was not made a part of the record on appeal. *Turner, supra* at 178, n. 2. However, the transcript is not evidence which presents petitioner's case "in a significantly different posture from that considered by the Massachusetts Supreme Judicial Court," *Needel v. Scafati,* 1 Cir. 1969, 412 F.2d 761, 765-66, *cert. denied,* 1969, 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 113; and therefore its unavailability at the Supreme Judicial Court level does not require dismissal of the petition for failure to exhaust state remedies. *Nelson v. Moore,* 1 Cir. 1972, 470 F.2d 1192, 1196-98, *cert. denied,* 1973, 412 U.S. 951, 93 S.Ct. 3017, 37 L.Ed.2d 1003.

3. Counsel may have been understandably confused about the precise meaning of this ruling in light of the judge's determination that the witnesses each properly invoked their privilege and in view of the trial judge's equivocation on the Fifth Amendment issue. The judge appears to have adopted a very broad view of the privilege, which may have further compounded the confusion. For example, he allowed Wallace to claim the privilege in response to a question about the gun used in the March 25, 1974 robbery. Trial Transcript, at 5-59-63. See also, Trial Transcript, at 4-106.

erred in denying petitioner's motion for a change of venue due to prejudicial pretrial publicity, and insofar as M.G.L. c. 277, § 51 precludes transfer to nonadjoining counties it is unconstitutional, Brief of the Defendant, at 1–8; (2) that the trial court erred in permitting Wallace and Evans to invoke the Fifth Amendment as to past crimes and violated petitioner's Sixth Amendment rights and rights under Article 12 of the Declaration of Rights of the Constitution of the Commonwealth by so limiting cross-examination without also striking the witnesses' direct testimony, Brief for the Defendant, at 9–21; (3) that the trial court erred in denying petitioner's motion for a directed verdict, Brief for the Defendant, at 21–24; and (4) that the trial court erred in various evidentiary rulings and by criticizing the defendant in front of the jury, Brief of the Defendant, at 24–35. The Supreme Judicial Court affirmed the judgments, and petitioner filed this petition for habeas relief, advancing the same arguments that he urged before the Supreme Judicial Court. We, find, therefore, that petitioner has exhausted his state remedies with respect to each of his claims. *See, Picard v. Connor,* 1971, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438; *Nelson v. Moore,* 1 Cir. 1972, 470 F.2d 1192, 1197, *cert. denied,* 1973, 412 U.S. 951,[4] 93 S.Ct. 3017, 37 L.Ed.2d 1003.

Upon receiving respondent's answer, we referred petitioner's claims to a Magistrate pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). The Magistrate filed his *Report and Recommendation on Petition for a Writ of Habeas Corpus* on December 11, 1978, in which he addressed each of petitioner's arguments and recommended that the petition be denied. Petitioner then filed *Petitioner's Objection to the Recommendation of the Magistrate* and subsequently submitted *Petitioner's Specification of Objections* in response to our January 13, 1979 Procedural Order requiring petitioner to specify the parts of the Magistrate's recommendations to which he objects and to state the grounds for his objections. We heard oral argument on February 23, 1979.

Under Rule 3(b) of the *Rules for United States Magistrates in the United States District Court for the District of Massachusetts,* February 12, 1979, it is our duty to render a *de novo* determination of those portions of the Magistrate's recommendations to which objection is made. In his *Specification, supra,* petitioner specifically objects only to those parts of the Magistrate's recommendation relating to (1) the trial court's resolution of the Fifth and Sixth Amendment issues regarding cross-examination of Wallace and Evans and (2) the trial court's denial of petitioner's motion for a directed verdict insofar as denial of that motion resulted from the prior denial of the motions to strike. In view of petitioner's failure to object with specificity to the Magistrate's recommendations relative to petitioner's other claims and seeing no reason to disturb the recommendation of the Magistrate, we accept those portions of the Magistrate's report and hold that the publicity surrounding petitioner's trial was not so prejudicial as to prevent him from having a fair trial; that the denial of petitioner's motion for a directed verdict insofar as the motion was based on failure to comply with M.G.L. c. 233, § 20I does not raise a constitutional question, and that the various evidentiary rulings and the comment by the judge, if improper, either are harmless error or do not rise to the level of a constitutional violation.

---

**4.** The first, third and fourth issues were squarely presented in petitioner's brief to the Supreme Judicial Court, and the Court discussed them in some detail. The third issue, whether failure to strike the direct testimony of Wallace and Evans in the face of their refusal to answer questions about the 1973 robberies of the Cumberland Farms Store violated petitioner's Sixth Amendment rights, was also presented. Brief for the Defendant, at 17, 21, *citing Commonwealth v. Johnson,* 1974 Adv.Sh. 1049, 1063 n.

11 (collecting cases applying the *Cardillo* doctrine setting forth the remedy of striking direct testimony). And the Court treated it, even though under a debatable impression about the significance of this cross examination to petitioner's defense. *See, Turner, supra,* 1977 Mass.Adv.Sh., at 180. Hence petitioner directly presented his Sixth Amendment theory, or its "substantial equivalent", to the state court. *Picard, supra.*

Petitioner's principal contention may be separated into two different arguments: (1) that the trial court abridged petitioner's Sixth Amendment rights by allowing the witnesses Wallace and Evans to invoke the Fifth Amendment and refuse to answer questions put by petitioner's counsel, after each had waived his privilege by testifying to those same matters during the grand jury proceedings and (2) that even if the witnesses had not waived their Fifth Amendment privilege and even if they properly invoked it during cross-examination, the trial court's denial of petitioner's motion to strike the witnesses' direct testimony violated petitioner's Sixth Amendment rights. We find the first argument to be without merit, at least with respect to the witness John Wallace, but grant the writ because we conclude, after examining the record and the briefs and hearing oral argument, that the trial court erred in refusing to strike the direct testimony of John Wallace and either in permitting James Evans to assert his Fifth Amendment privilege or in refusing to strike his direct testimony as well.

Turning to petitioner's first argument, that Wallace and Evans had waived their Fifth Amendment privilege regarding testimony about past crimes, we conclude from the grand jury and trial transcripts that at least the witness John Wallace did not waive his privilege. We adopt the factual finding of the state trial court, affirmed by the Massachusetts Supreme Judicial Court, *Turner, supra,* at 181; that Wallace was under the mistaken impression that he was immunized from prosecution for past crimes that related in some very broad fashion to the attempted robbery and murder being investigated. Trial Transcript, at 4–133–135; *see, Souza v. Howard,* 1 Cir. 1973, 488 F.2d 462, 466–68; 28 U.S.C. § 2254(d). During the grand jury proceedings, the following colloquy took place:

D. A. Welch: In other words, you understand that by being granted immunity you cannot be prosecuted for that particular case on that particular day in Dedham. Do you understand that?

Mr. Wallace: I was under the influence on my testimony. Yes, and for any relating case relating to the crime.

D. A. Welch: Yes, that arised out of that crime on that day.

Wallace testified on voir dire that he believed that the prior robbery of the same Dedham store was "related to" the crime under investigation because it was the prior robbery that prompted the selection of the Dedham store as a target on March 25, 1974. This belief, coupled with the fact that he was promised "consideration" for past crimes, a promise which he easily could have confused with a grant of formal immunity and the fact that he never read the order granting him formal immunity until after he testified before the grand jury, Trial Transcript, at 4–138–142, convinces us that Wallace did not testify before the grand jury with full awareness of the consequences and hence did not voluntarily and intelligently waive his Fifth Amendment privilege regarding questions about past crimes for which he was not immunized. *Brady v. United States,* 1970, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747; *Smith v. United States,* 1949, 337 U.S. 137, 150, 69 S.Ct. 1000, 93 L.Ed. 1264; *Johnson v. Zerbst,* 1938, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461; *United States v. Johnson,* 1 Cir. 1973, 488 F.2d 1206, 1210.

Nor was Wallace under a grant of immunity covering those past crimes. The District Attorney did not apply to the Massachusetts Supreme Judicial Court for such an immunity order. Moreover, although Wallace may be able to enforce specific performance of the Commonwealth's promise of "consideration" either according to a contract theory, *see, Matter of DeSaulnier (No. 2),* 1971, 360 Mass. 761, 764, 276 N.E.2d 278; *cf., Santobello v. New York,* 1971, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427, or according to fundamental notions of fairness embodied in the Due Process Clause of the Fourteenth Amendment, *cf., Cooper v. United States,* 4 Cir. 1979, 594 F.2d 12, the District Attorney cannot grant immunity to a witness by promises of this type without first applying to the Massachusetts Su-

preme Judicial Court as required by M.G.L. c. 233, §§ 20C–20G, *Grand Jurors for Middlesex County for Year 1974 v. Wallace,* 1976, 369 Mass. 876, 343 N.E.2d 844. Furthermore, neither a practical unlikelihood of prosecution nor the prosecutor's denial of an intention to prosecute negates an otherwise proper invocation of the Fifth Amendment. *United States v. Johnson,* 1 Cir. 1973, 488 F.2d 1206, 1209, n. 2. Hence in the absence of an inclusive grant of immunity and an effective waiver, Wallace was entitled to assert his Fifth Amendment privilege in response to questions about past crimes.

Evans' situation is less clear because the trial court judge neither conducted an inquiry into the individual circumstances surrounding his waiver nor set forth the basis for his conclusion that the waiver was inef-

fectual. In these circumstances, we would be warranted in conducting an evidentiary hearing. *See, Souza, supra*; 28 U.S.C. § 2254(d)(8). But a final determination of the waiver issue is unnecessary in light of our granting the petition on the basis of petitioner's second argument. If petitioner is retried, the trial court judge can decide the waiver issue.[5]

The scope of petitioner's Sixth Amendment right of cross-examination in a situation like the instant case where a government witness testifies fully on direct but evokes his Fifth Amendment privilege in response to questions on cross is controlled by the doctrine developed in *United States v. Cardillo,* 2 Cir. 1963, 316 F.2d 606, *cert. denied,* 1963, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55, and its progeny.[6] *See, e. g.,*

5. We need not reach the question of whether, if Evans waived his privilege during the grand jury proceeding, that waiver applies to the trial proceedings as well. This issue is certainly a constitutional question since it involves defining the limits of the Fifth Amendment privilege. There is a split of authority both among the federal courts and between the law of the First Circuit and Massachusetts state law. In important dictum, the Massachusetts Supreme Court has subscribed to an approach to the continuing waiver theory that would make a grand jury waiver effective at the trial of the same case. *Matter of DeSaulnier,* 1971, 360 Mass. 761, 765–66, 276 N.E.2d 278. The First Circuit, on the other hand, has adhered to a rule that makes a waiver effective only for the particular proceeding in which the witness appears. *United States v. Cain,* 1 Cir. 1976, 544 F.2d 1113, 1117; *Ottomano v. United States,* 1 Cir. 1972, 468 F.2d 269, 273–74, citing *In Re Neff,* 3 Cir. 1953, 206 F.2d 149. A final decision of this question would depend in the first instance on whether, as a matter of federal law, we ought to follow the state or federal rule. *Cf., Fay v. Noia,* 1963, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 ("waiver affecting federal rights is a federal question").

6. Framing the issue as one involving a clash between the Fifth and Sixth Amendments, respondent urges us to follow the reasoning of *Commonwealth v. Francis,* 1978 Mass.Adv.Sh. 1253, 375 N.E.2d 1221, which held that the Sixth Amendment right to confront and cross-examine must bow to the Fifth Amendment privilege against self-incrimination. We agree to the extent that the Fifth Amendment privilege, when properly invoked, must be honored, even if to do so would significantly impede the defendant's ability to cross-examine a crucial

witness. Contrary to respondent's suggestion, however, the analysis may not stop at this point.

Respondent's reliance on *Francis* overlooks an important distinction between that case and this one. In *Francis,* defendant sought to examine his own witness, who in response to several critical questions put by defense counsel refused to answer, citing his Fifth Amendment privilege. The right at stake in *Francis* and similar cases is the Sixth Amendment right of compulsory process, not the right to confront and cross-examine, *see, Roznovsky v. Estelle,* 5 Cir. 1977, 546 F.2d 1185, and the compulsory process right, although it may override state interests of lesser magnitude, *see, Washington v. Texas,* 1967, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019, must give way to the Fifth Amendment privilege. In such circumstances there are only two alternatives: either the witness must answer incriminating questions or he may refuse to answer. The supremacy of the Fifth Amendment compels selection of the latter alternative. As *Francis* itself recognizes, 1978 Mass.Adv.Sh., at 1256–57, 375 N.E.2d 1221, the situation is quite different when, like the instant case, a witness refuses to answer questions on cross-examination, impairing defendant's ability to confront and cross-examine. *See, United States v. Cardillo,* 2 Cir. 1963, 316 F.2d 606, *cert. denied,* 1963, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55; *Commonwealth v. Johnson,* 1974, 365 Mass. 534, 547, n. 11, 313 N.E.2d 571; *cf., Douglas v. Alabama,* 1965, 380 U.S. 415, 419–20, 85 S.Ct. 1074, 13 L.Ed.2d 934. Here there is a third alternative in addition to the two already mentioned: the witness may refuse to answer questions on cross but, if he does so, his testimony on direct may be stricken.

*United States v. Newman,* 3 Cir. 1974, 490 F.2d 139, 145–46; *United States v. Rogers,* 7 Cir. 1973, 475 F.2d 821, 826–27; *Fountain v. United States,* 5 Cir. 1967, 384 F.2d 624, 628–29, *cert. denied,* 1968, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105. Whether the trial court's failure to strike all or a part of a witness's direct testimony when that witness refuses to answer questions on cross amounts to constitutional error involves "an analysis of the purpose of the inquiry and the role which the answer, if given, might have played in the defense," 316 F.2d at 612, *Cardillo, supra,* which sets forth the proper standards:

> In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of a privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. . .
>
> On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part.

316 F.2d at 611.

*Newman, supra,* applied *Cardillo* to a situation quite similar to the case at bar. In *Newman,* involving an appeal from a conviction for illegal wiretapping, the government at trial had called the defendant's accomplice as a witness, seeking *inter alia* to establish the existence of a wiretapping partnership involving the defendant and the witness. On cross-examination, the witness invoked his Fifth Amendment privilege in response to questions concerning unrelated past wiretaps that the witness had performed. The purpose of the defense in asking some of these questions was to impeach the witness's credibility by showing past criminal conduct. Finding that such questions involved only collateral matters and that any impeachment would be only cumulative, the Court of Appeals, following *Cardillo,* held that the resulting restriction on cross-examination did not abridge defendant's Sixth Amendment confrontation right. 490 F.2d at 145. The defense, however, also sought by means of other questions about past crimes to show that the defendant had not participated with the witness in past wiretaps and thereby to weaken the government's evidence supporting the existence of a partnership. As to these questions, the court held that they related to the truthfulness of the direct testimony and concerned neither collateral nor cumulative subject matter. 490 F.2d at 145. The court concluded that the Sixth Amendment required the striking of that portion of the witness's direct testimony dealing with the existence of a partnership. 490 F.2d at 146.

The instant case also involves defense questions put to an admitted accomplice concerning the details of past crimes. According to *Cardillo* and *Newman,* we must examine the purposes served by cross-examination relating to this subject matter. Before the trial court and again on appeal, petitioner's counsel argued that, through cross examination about the prior robberies of the same Cumberland Farms store, he could impeach Wallace's and Evans' credibility and support his own position that petitioner was not at the store on the night of the robbery. Trial Transcript at 4–87; Brief of the Defendant, at 17. The Supreme Judicial Court assumed that petitioner was only interested in showing prior criminal acts to attack general credibility or character evidence indicating a criminal propensity. 1977 Mass.Adv.Sh., at 180. It properly concluded that defendant could accomplish neither objective by the excluded cross examination of Wallace and Evans.

The Court, however, overlooked the crucial purpose of petitioner's line of questioning. The petitioner sought not so much to impeach the general credibility of the witnesses but rather to cast doubt on the account of the events they gave on direct examination. Wallace and Evans testified on direct to having waited in the car while the Turners committed an armed robbery of the Cumberland Farms store, a store that Wallace and Evans each had robbed on separate occasions just five to six months earlier. Had the petitioner been able to cross-examine the witnesses about the prior robberies, he could have explored similarities between the modus operandi of those robberies and the conduct of the March 25, 1974 robbery. Wallace and Evans may have exhibited unusual behavior in the 1973 robberies duplicated by the 1974 robbers, see generally, Commonwealth v. Murphy, 1933, 282 Mass. 593, 597–99, 185 N.E. 486, or there may have been significant similarities in the warnings given to the store clerks on each occasion. Indeed petitioner was unable even to determine what type of gun had been used in the prior robberies so that he might compare it with the gun used in the 1974 robbery.[7] Because petitioner was unable to probe the details of the 1973 robberies, there was no foundation for an in-depth examination of other witnesses, for example, the store clerk. Defense counsel was aware of the importance of this general line of cross-examination, for after asking Lieutenant Regan whether Evans admitted the September 1973 robbery, counsel also asked whether Evans described his "modus operandi" in 1973, to which Regan answered in the negative. Trial Transcript, at 7–200.

Furthermore, the judge's limitation on cross-examination prevented petitioner from effectively challenging the witnesses' testimony that they chose not to accompany the petitioner and his brother into the store. Wallace and Evans were familiar with the layout of the store and possibly also with the habits of the clerk. Neither petitioner nor his brother had such first-hand experience. The fact that Wallace and Evans had committed prior robberies of the same store was brought out during trial and petitioner was not foreclosed from asking general questions about the witnesses' reasons for proceeding as they claimed they did. However, petitioner was unable to ask questions about the circumstances of the 1973 robberies and probe information that the witnesses may have gained during those prior robberies that might have been helpful to someone pulling a second robbery of the same store. For example, information about the location of the safe or the position of the counter may have been of assistance. If the witnesses had admitted to learning significant facts from their previous experiences with the store, that information would have been an important basis for challenging their rationale for not entering the store during the 1974 robbery.

Petitioner's theory at trial was that "Wallace and Evans, rather than the Turners, had, in fact, committed the crimes on March 25, 1975 [sic], and were using the shield of immunity from prosecution to pin the blame on the defendants." Brief for the Defendant, at 17, Commonwealth v. Turner, 1977 Mass.Adv.Sh. 173. The limitation on cross examination significantly curtailed petitioner's ability to elicit facts in support of that theory and prevented him from pursuing a line of questioning that might have cast doubt on the version of the events given by the two critical prosecution witnesses during their direct testimony. The trial court's offer allowing the petitioner to read the grand jury transcript in its entirety to the petit jury was a weak and wholly inadequate substitute for full and effective cross examination.

The right of cross examination is one of the cornerstones of our criminal trial process. See, Davis v. Alaska, 1974, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. The

7. The trial judge even allowed the witness Wallace to claim his privilege in response to questions about the gun that was used in the March 25, 1974 robbery, the very crime for which he was granted immunity. Trial Transcript, at 5–58–63. The petitioner therefore was unable to ask whether Wallace owned such a gun or knew how to fire one.

 

defendant must be given a wide latitude to explore all relevant matters even though he is unable to state to the court the facts that he expects to uncover or to show that cross examination would necessarily discredit the witness:

> Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; . . . It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.

*Alford v. United States*, 1931, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624; *accord, Cardillo, supra*, at 613 n. 4. The trial judge has discretion to limit the scope of cross examination, but he may not exercise that discretion to cut off a complete, nonrepetitive inquiry into issues relevant to matters to which the witness testified on direct.

 The line of questioning in the instant case related intimately to the truthfulness of the direct testimony of both Wallace and Evans and therefore was neither cumulative nor collateral. Petitioner was "deprived of his right to test the truth of the direct testimony." *Fountain, supra*, at 628. Hence the Sixth Amendment required granting the petitioner's motion to strike the direct testimony of Wallace and, in the event Evans did not waive his privilege, the direct testimony of Evans as well. Since questioning on cross-examination might have raised doubt in the minds of the jury concerning the witnesses' truthfulness and since doubt as to part of the direct testimony may very well have infected the remainder, *see, Cardillo, supra*, at 611–613, the trial court should have stricken all, not just a portion, of the testimony on direct. *Cardillo, supra*, at 613.

We hold, therefore, that the trial judge committed error seriously prejudicing the petitioner's ability to mount an effective defense and abridging his Sixth Amendment confrontation right. He improperly denied petitioner's motions to strike and failed to make a sufficiently detailed inquiry into Evans' waiver of his Fifth Amendment privilege. In our opinion, neither error was harmless beyond a reasonable doubt. *Chapman v. California*, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. Accordingly the writ of habeas corpus is granted and it is ordered that petitioner be released from confinement, unless within sixty days the Commonwealth of Massachusetts grants petitioner a new trial.