COMMONWEALTH *vs.* SHEILA FUNCHES
(and a companion case[1]).

Suffolk.   September 10, 1979. — November 30, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Constitutional Law,* Self-incrimination, Confrontation of witness, Double
    jeopardy. *Witness,* Self-incrimination. *Waiver. Practice, Criminal,*
    New trial, Directed verdict. *Homicide. Robbery. Joint Enterprise.*

At a trial for armed robbery and murder, where the prosecutor's principal
    witness, nineteen years old and with counsel, properly asserted his
    privilege against self-incrimination by refusing on cross-examination
    to answer questions concerning a conversation, at the door of an apart-
    ment the defendants sought to enter, which could expose the witness to
    prosecution for drug violations and perjury, but in which he admitted
    no element of a crime, he did not waive his privilege by merely stating
    prior to invoking it that the defendants had told him they had come to
    buy some heroin, and the judge did not err in refusing to compel further
    testimony concerning the conversation from the witness. [288-291]
Under the confrontation clause of the Sixth Amendment to the United
    States Constitution and art. 12 of the Declaration of Rights of the
    Massachusetts Constitution, it was prejudicial error for the judge, at
    the trial of two women for armed robbery and murder occurring in an
    apartment they sought to enter, to deny their motions to strike the
    direct testimony of the prosecution's chief witness, preceding his prop-
    er invocation on cross-examination of his constitutional privilege
    against self-incrimination, relating to the crucial sequence of events at
    the apartment door, where the prosecution's theory was that the de-
    fendants were decoys for perpetration of the robbery by two men who
    burst into the apartment, and the defendants' theory was that they
    came to the apartment solely to buy drugs.  [291-294]
Upon reversal of judgments of conviction of crimes against defendants
    who appealed from a denial of their motions for a new trial, and opin-
    ion by this court that the evidence was insufficient to warrant convic-
    tion, the constitutional prohibition against double jeopardy precluded
    entry of an order for a new trial.  [294]

[1] The companion case is by the Commonwealth against Gloria Jordan.

At the trial of two women for armed robbery occurring in an apartment which the defendants sought to enter but from which they fled after two gunmen burst in, one of whom shot an occupant, where the Commonwealth contended the defendants engaged in a joint venture with the gunmen to commit robbery, and the defendants contended they went to the apartment solely to buy drugs, denial of the defendants' motions for directed verdicts at the close of the prosecution's case was error, since no evidence properly admitted indicated that the defendants participated overtly in the robbery, and evidence of one defendant's friendship with the gunmen, and of the other defendant's association with them just before and just after the shooting would not enable a juror to overcome a reasonable doubt that the defendants had no intent to rob or to participate in the robbery. [294-296]

Following trial of two defendants on two indictments at which the Commonwealth had a fair opportunity to offer its proof, and in which a correct ruling on the defendants' motions to strike the testimony of the prosecutor's chief witness, instead of prejudicial error in denial of the motions, would have required a favorable ruling on the defendants' motions for directed verdicts as a matter of law, this court ordered judgment of conviction on both indictments reversed, the verdicts set aside, and the entry of judgment of not guilty under both indictments. [296-297]

INDICTMENTS found and returned in the Superior Court on February 25, 1977.

The cases were tried before *Griffin*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Wade M. Welch* for Gloria Jordan.

*Joyce Poulin* (*Henry F. Owens, III,* with her) for Sheila Funches.

*Leonard J. Henson,* Assistant District Attorney (*Deborah Goldman,* Assistant District Attorney, with him) for the Commonwealth.

LIACOS, J. Sheila Funches and Gloria Jordan were each indicted for murder in the first degree; armed assault with intent to rob; assault and battery by means of a dangerous weapon; armed assault in a dwelling; armed robbery; and assault and battery. Tried in the Superior Court to a jury, both defendants were found guilty of murder in the second

degree and guilty on all other indictments. The trial judge sentenced the defendants to life imprisonment at the Massachusetts Correctional Institution at Framingham on the murder indictments, and she filed the other indictments. Motions for a new trial were filed and denied. Appeals were taken on both the convictions and the denials of the motions. The defendants' appeals are here for review under G. L. c. 278, §§ 33A-33G. We reverse the convictions as to both defendants.

The murder occurred on February 6, 1977, in Dolores Smith's apartment at No. 908, 7 Montpelier Road, Columbia Point housing project, Dorchester. About 11:15 P.M., Sharon Waddie, one of several people in the apartment, heard a knock and went to the front door. She had a brief conversation with defendant Funches through the door and saw Funches through the peephole. After a second knock, Dolores Smith's nineteen year old son, Gregory, went to the door.

Gregory Smith testified on direct examination that he saw defendants Funches and Jordan through the peephole. When he opened the door slightly, Funches asked if his mother was at home, and he said his mother was asleep. Smith testified that there was no further conversation. He testified he then saw a man, later identified as Robert Thomas, running down the hall toward the apartment and carrying a sawed-off shotgun. Smith tried to close the door, but Funches and Jordan had their feet in the doorway and pushed against the door. Thomas soon joined them, and Smith could not hold them out. The two women did not enter the apartment, but Thomas and another man, identified as Donnie Stewart, burst in. Carrying a handgun, Stewart assaulted Gregory Smith and Sharon Waddie and demanded money. The two gunmen forced some of the occupants of the apartment into the kitchen. One of the occupants, Ronald Allen, spoke to Stewart. Stewart shot him, and he died ten days later. Thomas and Stewart got between $20 and $40 from Dolores Smith, and fled.[2]

---

[2] Thomas was apprehended the night of the shooting. He was brought to trial with Funches and Jordan, and pleaded guilty to murder in the second

On cross-examination, it emerged that Gregory Smith had known Funches and Stewart for a long time and that he recognized Jordan from seeing her about the project. Also, Stewart had been in the Smith apartment at times before the shooting. Smith further testified that when Funches and Jordan came to the door on the night of the shooting they told him they had come to buy heroin.

Gregory Smith was the only witness who gave testimony concerning the details of the defendants' activity at the apartment door. However, the Commonwealth called two Boston police officers, Charles Edward Hardy and James Neal, who had taken statements from the defendants. Officer Hardy located Funches at 6 Blair Road, Dorchester, on the night of February 6 shortly after the shooting. He learned from her that she and Jordan were at the door of the Smith apartment speaking to Gregory when two armed males rushed by and pushed their way into the apartment; both women then ran away. She said she did not recognize the men, but admitted to knowing a Donald Stewart. Officer Neil testified that Funches later told him she had been going with Robert Thomas. The trial judge gave a limiting instruction that this testimony of both Hardy and Neal was not admissible against defendant Jordan.

When Officer Neal arrested Jordan on February 12, 1977, she told him that she went to the Smith apartment late on February 6. She did not put her foot in the door. Thomas pushed his way in. Stewart followed and shut and locked the door behind him. Jordan admitted that she was with the two gunmen at 6 Blair Road both immediately before and immediately after the shooting. She told Neal that she had gone to 7 Montpelier Road to buy drugs, but had only $20 to spend. When asked if there was talk of a "rip-off" before she left for the scene of the shooting, she replied, "not in the open." The judge gave a limiting instruction that Neal's testimony was not admissible against Funches.

degree and lesser felonies soon after the trial began. He was sentenced to life imprisonment at the Massachusetts Correctional Institution at Walpole. Stewart is still at large.

The Commonwealth presented other witnesses, but none whose testimony bore directly on the defendants' roles in the robbery and murder. At the close of the Commonwealth's evidence, both defendants moved for a directed verdict, and both motions were denied. The defendants presented no evidence.

A crucial incident at the trial occurred during the cross-examination of Gregory Smith. Counsel asked Smith whether the defendants, while at the door, had informed him of the purpose of their visit.[3] The prosecution objected on the ground that a response might require the witness to incriminate himself for conspiracy to violate the narcotic drug laws, G. L. c. 94C, § 40. The judge appointed counsel for Smith. During a voir dire, Smith invoked his privilege under the Fifth Amendment to the United States Constitution and refused to answer defense counsel's questions relating to the conversation at the door. Counsel offered to prove that, if Smith answered the questions, he would say that the defendants told him they wanted to buy heroin, but had only $20; Smith replied that he only had $30 bags to sell; and after bargaining, Smith agreed to cut a bag and sell them $20 worth.

Counsel contended that this testimony not only bore on Smith's credibility, but also supported the defense theory that the defendants went to the apartment for the purpose of buying drugs. Furthermore, counsel argued that Smith waived his privilege against self-incrimination by giving statements to the police and the grand jury and by answering at trial that the defendants told him they had come to buy drugs. Thus, the defendants moved that the judge compel the witness to answer or alternatively to strike his direct testimony or to declare a mistrial. The judge denied all motions, but permitted counsel to ask the incriminating questions before the jury. Smith again refused to answer.

---

[3] DEFENSE COUNSEL: "And they told you they were there to buy some heroin; is that right?" THE WITNESS: "Yes." DEFENSE COUNSEL: "And you had a talk about price with them at the door?"

Jordan and Funches join in attacking the judge's ruling on these motions, and Funches further asserts that the judge erred in denying her motion for a directed verdict. The defendants have made several other assignments of error,[4] but, in view of our ground for decision, we need not reach them.

We first consider whether Gregory Smith, having properly asserted his Fifth Amendment privilege against self-incrimination, nevertheless waived his right to remain silent. No one in the present case appears to dispute that Gregory Smith was entitled to invoke the Fifth Amendment.[5] However, the defendants argue that he waived his right by answering "Yes" to counsel's question, "And they told you

---

[4] Both defendants assert that the judge erred (1) in denying their motion to compel further testimony on the cross-examination of the Commonwealth's witness, Dolores Smith (who also successfully invoked her privilege against self-incrimination on cross-examination relating to the presence or sale of drugs in the apartment) or in the alternative, to strike her testimony or declare a mistrial; (2) in denying the defendants' motions for a new trial; (3) in denying their request that the jury be polled; and (4) in instructing the jury that they were not to draw any inference from the fact that Gregory and Dolores Smith invoked their Fifth Amendment privilege not to testify on cross-examination. In addition, Funches assigns as error (1) the judge's denial of her motion to dismiss on the ground that the felony-murder rule in G. L. c. 265, § 1, violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (2) the denial of her motion to sever in light of *Bruton* v. *United States*, 391 U.S. 123 (1968); (3) the denial of her motion for mistrial when the prosecutor misstated the evidence against her in connection with Jordan's prior statement to Officer Neal; and (4) the refusal to instruct the jury on the lesser included offense of manslaughter. Jordan assigns as error (1) the judge's refusal to declare a mistrial after Gregory Smith was asked the defendant's name and answered, "She has so many names. They call her Rodney"; and (2) the refusal to instruct the jury on the lesser included offense of assault and battery.

[5] Answering the questions concerning a conversation about drugs could lead to prosecution for conspiracy to violate the drug laws, G. L. c. 94C, § 40, or for the substantive offense, G. L. c. 94C, §§ 34-35. Furthermore, by admitting to a fairly lengthy conversation at the door, Smith may have contradicted earlier testimony that he had no such conversation. He could thereby have exposed himself to prosecution for perjury. G. L. c. 268, § 1.

they were there to buy some heroin; is that right?"[6] The defendants further argue that, having broached the subject of the conversation about drugs, he could not refuse to testify about the details of the conversation.

We apply Federal standards to determine whether a witness has properly invoked the privilege against self-incrimination. *Gambale* v. *Commonwealth,* 355 Mass. 394, cert. denied, 396 U.S 881 (1969). *Murphy* v. *Commonwealth,* 354 Mass. 81 (1968). *Commonwealth* v. *Baker,* 348 Mass. 60 (1964). A witness may refuse to testify unless it is "*'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate" (emphasis in original). *Hoffman* v. *United States,* 341 U.S. 479, 488 (1951). "The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute. . . ." *Id.* at 486. This broad approach is consistent with a "strict, not lax, observance of the constitutional protection," *Ullmann* v. *United States,* 350 U.S. 422, 429 (1956), for the Fifth Amendment "must not be interpreted in a hostile or niggardly spirit." *Id.* at 426.

In *Taylor* v. *Commonwealth,* 369 Mass. 183, 189 (1975), we acknowledged a line of authority, both venerable and sparse, setting out the doctrine of waiver by testimony. See *Evans* v. *O'Connor,* 174 Mass. 287, 290-291 (1899); *Commonwealth* v. *Pratt,* 126 Mass. 462 (1879); *Commonwealth* v. *Price,* 10 Gray 472 (1858); *Foster* v. *Pierce,* 11 Cush. 437 (1853). According to these cases, "[T]he witness must claim his privilege in the outset, when the testimony he is about to give, will, if he answers fully all that appertains to it, expose him to a criminal charge, and if he does not, he waives it altogether." *Foster* v. *Pierce, supra* at 439. Thus, when a

---

[6] Although at trial the defendants argued that Smith waived his privilege by making statements to the police and to the grand jury, they do not press that argument here. In fact, those statements appear not to have contained any reference to a drug sale.

witness "not a party to a cause, voluntarily testifies to a *fact* of an incriminating nature he waives his privilege as to subsequent questions seeking *related facts*" (emphasis supplied). *Taylor, supra* at 189. As we noted in *Taylor, supra* at 190, the doctrine depends on two rationales. First, the witness's initial testimony, freely given, has incriminated him, so there is little risk that further testimony about the same transaction will incriminate him further. Second, judges should not permit a witness to edit his own testimony by selective invocation of the privilege; otherwise, the fact-finding process might be imperilled. *Commonwealth* v. *Price, supra* at 476. 8 J. Wigmore, Evidence § 2276, at 456 (McNaughton rev. 1961). Only the second theory will sustain the rule of the ancient cases, yet that theory is not wholly consistent with the purposes of the constitutional privilege.[7] See *Murphy* v. *Waterfront Comm'n*, 378 U.S. 52, 55 (1964).

*Rogers* v. *United States*, 340 U.S. 367 (1951), supports this view. A witness before a grand jury admitted one element of a violation of the Smith Act, 54 Stat. 671 (1940) (current version at 18 U.S.C. § 2385 [1976]), by stating that she held an office in the Communist party. The United States Supreme Court held that this admission constituted a waiver of her privilege with respect to her party activities, and that there was no "real danger of legal detriment arising from [further] disclosure." *Id.* at 373. *Rogers*, then, suggests a two-step analysis. The witness waives his privilege by admitting to at least one element of a crime. Even then, the witness does not waive his privilege as to disclosures that pose a "real danger."[8]

---

[7] A defendant's interest in accurate fact-finding belongs in a Sixth Amendment analysis under the confrontation clause. It should not qualify the witness's Fifth Amendment privilege. Moreover, we do not believe that invocation of the privilege after the witness has given some testimony about a transaction necessarily distorts the evidence more than invocation at the outset. In its nature, the privilege is a shield that hides the truth. See generally Note, Waiver of the Privilege Against Self-Incrimination, 14 Stan. L. Rev. 811 (1962).

[8] A "real danger of legal detriment" arises when further disclosure would supply a link in the chain of evidence.

We do not decide today whether this approach derived from *Rogers* goes far enough to protect the witness's privilege,[9] but the waiver doctrine in this Commonwealth must not fall short of the Federal standards that we find in the *Rogers* decision. In so far as our cases may be read not to require as a condition of waiver that the witness admit to at least one element of a crime, we decline to follow them.[10]

Applying these principles to Gregory Smith's purported waiver, we find that Smith admitted to no element of a crime. He merely testified that the women told him that they wanted to buy heroin. No waiver occurred, and the judge did not err in refusing to compel further testimony.

Sustaining Gregory Smith's claim of privilege does not end our inquiry. We must determine whether the confrontation clause of the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution required the judge to strike Smith's testimony concerning the events at the door.[11]

---

[9] In *Arndstein* v. *McCarthy*, 254 U.S. 71 (1920), the United States Supreme Court refused to find a waiver. The initial testimony did not "amount to an admission of guilt or furnish clear proof of crime. . . . It is impossible to say from mere consideration of the questions propounded, in the light of the circumstances disclosed, that they could have been answered with entire impunity." *Id.* at 72. No waiver would occur unless the witness admitted to *all* of the elements of the crime. This rule is commendable because it is consistent with the purpose of the privilege to protect the witness from compelled self-incrimination, and it spares both the witness and trial judge from wrestling with factual nuances too slippery to grasp.

[10] Our decision in *Taylor* v. *Commonwealth*, 369 Mass. 183 (1975), rests undisturbed. In *Taylor*, we held that a witness cannot waive his privilege by testimony unless the testimony is freely given. The witness, Taylor, was a sixteen year old who repeatedly exhibited confusion and reluctance to testify and who was not informed of his privilege. By contrast, Gregory Smith was nineteen years old and was provided counsel to advise him. As far as appears from the transcript, he answered all questions willingly until he invoked the privilege.

[11] Relying on *Commonwealth* v. *Francis*, 375 Mass. 211, cert. denied, 439 U.S. 872 (1978), the prosecution argues that our inquiry should stop with a determination that Smith properly invoked the privilege. In *Francis*, we did refuse to "balance" the defendant's Sixth Amendment right to

"The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*" (emphasis in original). *Davis* v. *Alaska*, 415 U.S. 308, 315-316 (1974), quoting from 5 J. Wigmore, Evidence § 1395, at 123 (3d ed. 1940). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis* v. *Alaska, supra* at 316. See also *Smith* v. *Illinois,* 390 U.S. 129 (1968). Although the cross-examiner may range free and delve deep in order to attack the witness's credibility or present an alternative view of the facts, he cannot invade the witness's protection from self-incrimination. *Alford* v. *United States,* 282 U.S. 687, 694 (1931). Nevertheless, after the witness has testified on direct examination, refusal to answer the cross-examiner's questions may so distort the fact-finding process that the Constitution compels a remedy. Some or all of the direct testimony may be struck.[12]

---

compulsory process, see *Washington* v. *Texas,* 388 U.S. 14 (1967), against his own witness's Fifth Amendment rights. Similarly, once we determine that Smith did not waive his right to remain silent, his privilege will not yield to the defendants' Sixth Amendment confrontation rights. Cf. *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 761 (1977) ("The protection of the constitutionally protected privilege is not one that yields to 'reasonable' intrusions"). However, Smith is a prosecution witness who gave direct testimony damaging to the defendants. He refused to elaborate on cross-examination. This raises the possibility that his direct testimony should be struck, a choice not presented in *Francis.* See *Turner* v. *Fair,* 476 F. Supp. 874, 880 n.6 (D. Mass. 1979).

[12] An analogous need to strike direct testimony arises in the civil context when circumstances connected with the conduct of the cross-examination prevent an adequate opportunity to cross-examine. The witness may die or become ill during cross-examination; see, e.g., *Lewis* v. *Eagle Ins. Co.,* 10 Gray 508 (1858); *Fuller* v. *Rice,* 4 Gray 343 (1855); *People* v. *Manchetti,* 29 Cal. 2d 452 (1946); *Drescher* v. *Granite State Mach. Co.,* 96 N.H. 508 (1951); or may refuse to answer the cross-examiner; see, e.g., *DuBeau* v. *Smither & Mayton, Inc.,* 203 F.2d 395 (D.C. Cir. 1953). Professor Wigmore distinguishes refusal to answer when the witness is amenable to the court's summary process and when the witness is not. 5 J. Wigmore, Evidence § 1391 at 137-139 (Chadbourn rev. ed. 1974). Thus, when a witness refuses to answer the written interrogatories of a deposition, striking direct testimony may be especially necessary. This is

The leading case dealing with this dilemma is *United States* v. *Cardillo*, 316 F.2d 606 (2d Cir.), cert. denied, 375 U.S. 822 (1963), whose applicability we acknowledged in *Commonwealth* v. *Johnson*, 365 Mass. 534, 547 n.11 (1974). The necessity for striking direct testimony depends on "the purpose of the inquiry and the role which the answer, if given, might have played in the defense." *United States* v. *Cardillo, supra* at 612. We must determine how prejudicial the denial of cross-examination has been. If the witness's testimony would merely have been collateral or cumulative, the direct testimony need not be struck. *Id.* at 611.

Here, however, Gregory Smith was the chief prosecution witness. His direct testimony related to the crucial sequence of events at the door. Smith's involvement with drugs related to his credibility. More importantly, the prosecution's theory that the defendants were decoys for the robbery becomes less persuasive as the length of the conversation increases. Conversely, the defense theory that the defendants came to the apartment to buy drugs, and not to act as decoys, becomes more believable. The facts to be raised on cross-examination therefore went to the essence of the defense, and the judge should have struck all of Gregory Smith's testimony relating to the events at the door.[13] Cf.

---

a function of the witness's attitude toward the party taking the deposition and of the materiality of the answer not given. *Savage* v. *Birckhead*, 20 Pick. 167, 172 (1838). See *Stratford* v. *Ames*, 8 Allen 577, 579 (1864); *Robinson* v. *Boston & Worcester R.R.*, 7 Allen 393 (1863). The decision to strike the direct testimony is within the discretion of the trial judge.

A witness who properly invokes his Fifth Amendment privilege is similarly not vulnerable to summary process. Here too a strict rule favoring the motion to strike and dependent on the materiality of the testimony is appropriate. The need for striking redoubles when the witness appears in a criminal proceeding and the confrontation clause guarantees the opportunity for cross-examination.

[13] The prosecution might have avoided this result by applying for immunity for Gregory Smith when he went before the grand jury. G. L. c. 233, § 20E. Violation of the narcotic drug laws is among the offenses for which immunity may be granted. *Id.* § 20D. Immunity is not intended exclusively to protect accomplices whose testimony provides the only evidence for conviction. Cf. *Commonwealth* v. *DeBrosky*, 363

*United States* v. *Newman,* 490 F.2d 139 (3d Cir. 1974). There can be no question in these circumstances that the denial of the motions to strike constituted prejudicial error.

Having determined that the refusal to strike the testimony of Gregory Smith was prejudicial error, we turn our inquiry to the issue of proper disposition of these appeals. Both defendants appeal from a denial of their motions for a new trial, and hence it might be argued that reversal of the judgments of conviction should be followed by a mandate for a new trial. If, however, we consider the evidence insufficient, even with the testimony of Gregory Smith included, a new trial would not be permissible simply because such motions for new trial had been made. A new trial would be precluded by the constitutional prohibition against double jeopardy. *Burks* v. *United States,* 437 U.S. 1 (1978). See also G. L. c. 263, § 7.

Both defendants moved for directed verdicts at the close of the prosecution's case. "In reviewing the denial of a motion for a directed verdict in a criminal case, we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Campbell,* 378 Mass. 680, 686 (1979).[14] See *Commonwealth* v. *Borans, ante* 117, 134-135 (1979); *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979); *Jackson* v. *Virginia,* 443 U.S. 307, 314 (1979).

---

Mass. 718, 729 (1973). Here the transaction incriminating the witness was the same as the transaction implicating the defendants in the robbery. Testimony about that transaction was almost certain to run afoul of the witness's privilege. Granting immunity was the only way to obtain Smith's testimony without sacrificing the constitutional protections to which Smith and the defendants were entitled.

[14] While Funches argues error in the denial of her motion for a directed verdict, Jordan does not argue the directed verdict issue in her brief. We reach the issue as to Jordan, however, under our general powers to act to prevent "a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967).

The Commonwealth contends that the defendants, along with Robert Thomas and Donnie Stewart, engaged in a joint venture to commit armed robbery. When Stewart killed Ronald Allen, the defendants became chargeable with felony murder. In order to succeed with the joint venture theory, the prosecution must show that each defendant shared the mental state required for the crime of robbery. *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973). Furthermore, Funches and Jordan must each be shown to have participated in the crime as an aider or abettor. *Commonwealth* v. *Stasiun,* 349 Mass. 38, 49 (1965). Without such a showing, their mere presence at the scene is insufficient to support a conviction. *Commonwealth* v. *Campbell,* 378 Mass. 680, 689-690 (1979). *Commonwealth* v. *Clark,* 363 Mass. 467, 473 (1973).

We agree with the Commonwealth that, taken as a whole, including the testimony of Gregory Smith, the evidence was sufficient to withstand the motion of each defendant for a directed verdict. However, after Gregory Smith's testimony is struck, as it should have been, the case against Funches is almost nonexistent. Sharon Waddie spoke to her and saw her through the peephole at the Smith apartment. Funches told Officer Hardy that she and Jordan went to the apartment and, while they were talking to Gregory, the two gunmen burst past. She asserted that she did not recognize the gunmen, but later admitted that she knew a Donald Stewart and that she had been dating Robert Thomas. Without more, Funches's friendship with the gunmen does not color the fact of her presence at the door sufficiently to permit an inference of either intent or participation beyond a reasonable doubt.

The case against Jordan is only somewhat more substantial. She admitted to Officer Neal that she went to the apartment late at night to buy drugs and was present when the gunmen went in. She further admitted that she was with Thomas and Stewart just before and just after the shooting. Finally, when asked if, before the shooting, there had been talk of a "rip-off," she answered, "not in the

open." As with Funches, Jordan's association with the gun-men — even just before and just after the shooting — will not sustain the requisite inferences about her purpose and activity at the apartment. Viewing her cryptic response, "not in the open," in the light most favorable to the prosecution, we still find the proof of mens rea insufficient. *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965).

*Commonwealth* v. *Campbell, supra,* on which the Commonwealth relies, is distinguishable from the present case. The evidence in *Campbell* against the defendant Doherty was that he distracted the principal witness while the code-fendants were in the victim's cell. Later he was seen leaning over the tier rail near the cell and leaving hurriedly with the principals just before the body was found. We held that a reasonable jury could infer that the defendant stood watch and thus was an aider and abettor of the crime. Thus, Doherty was not merely present at the scene. Furthermore, the only inferences inconsistent with guilt — that the defendants just happened to be inside or near the victim's cell — were weakened by the defendants' failure to act on discovering the body. *Id.*

Without Smith's testimony, there is no evidence that the defendants participated overtly in the robbery. In fact, the inference that Funches and Jordan went to the apartment to buy drugs is at least as strong as any inference that their purpose was to serve as a decoy. Having gone to the apartment to buy drugs and having fled after the gunmen entered, they could not be expected to seek out the police. We conclude that a reasonable juror, confronted with the possibility that the defendants' purpose was to buy drugs, could not overcome a reasonable doubt about their intent or participation in the robbery.

All parties have failed to brief the issue of whether a new trial is permissible in a case such as this. We conclude, however, that no new trial can be ordered. We take this view not only because the Commonwealth had its "fair opportunity to offer whatever proof it could assemble," but also because had a correct ruling been made as to defend-

ants' motions to strike, a favorable ruling on their motions for directed verdicts would have been required as a matter of law.[15]

Accordingly, the judgments of conviction on both indictments are reversed, the verdicts set aside, and the cases are remanded to the Superior Court for entry of a judgment of not guilty under both indictments.

*So ordered.*

---

[15] Cf. *Burks* v. *United States,* 437 U.S 1, 11, 15 (1978); *Greene* v. *Massey,* 437 U.S. 19 (1978).