COMMONWEALTH vs. THOMAS F. CASALE & another.[1]

Suffolk.    April 10, 1980. — July 17, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Directed verdict. *Malice. Joint Enterprise.*

At a murder trial, there was sufficient evidence to warrant the conviction
    of two defendants of second degree murder even though there was no
    direct evidence as to which one of a group of men had shot the victim
    and no direct evidence of a joint venture.  [172-176]

INDICTMENTS found and returned in the Superior Court
on April 20, 1978.

The cases were tried before *McGuire*, J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Albert L. Hutton, Jr.,* for Thomas F. Casale.

*Joseph J. Balliro* for Vincent J. Federico.

*Brian J. Dobie,* Assistant District Attorney, for the Com-
monwealth.

QUIRICO, J.  Joseph A. Bruno, Jr., Thomas F. Casale, and
Vincent J. Federico were indicted for their alleged murder
in the first degree of Robert N. McFarlane.  After trial they
were convicted of murder in the second degree and sentenced
to life imprisonment.  The defendants filed motions for
directed verdicts at the conclusion of the Commonwealth's
case and again at the close of all the evidence.  The judge
denied the motions.  Four days after the verdicts, the de-
fendants, acting under G. L. c. 278, § 11, renewed their
motions for directed verdicts.  The judge denied the mo-

[1] The other defendant who is appealing is Vincent J. Federico.  The two
appellants were tried with a third defendant, Joseph A. Bruno, Jr., whose
case ended in a directed verdict of not guilty as will be noted in the opinion.

tions of Casale and Federico, but allowed Bruno's motion, ruling that the evidence was not sufficient to sustain the conviction.

Casale and Federico appealed to the Appeals Court from the judge's order denying their renewed motions for directed verdicts. We then ordered the case transferred to this court, sua sponte. We affirm the judgments.

We have recently stated that in reviewing the denial of motions for directed verdicts in criminal cases we must consider whether the evidence, in the light most favorable to the Commonwealth, notwithstanding that presented by the defendant, is sufficient to permit the jury to infer the existence of the essential elements of the crime charged; and, whether the evidence and the inferences permitted to be drawn therefrom are sufficient to bring minds of ordinary intelligence and sagacity to the persuasion of guilt beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Therefore, we consider first only the evidence admitted up to the time the Commonwealth rested when the motions were first filed, *Commonwealth* v. *Borans*, 379 Mass. 117, 134 (1979), *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976), and again the evidence after all parties have rested.

We now summarize the evidence introduced by the Commonwealth to the point where it rested. On Sunday, November 6, 1977, Lynne Russo, accompanied by the victim, Robert McFarlane, and by William Hackler and James Theologus, arrived at No. 20 Stillman Street in the North End of Boston between 10:15 and 10:30 A.M. Dominic Monforte was waiting for them. About fifteen minutes after arriving, they began to move Russo's possessions from her fifth floor apartment to the rented van which they had parked in front of the doorway to No. 20. McFarlane was not able to do any heavy work so he stayed downstairs and watched the van.

During the nearly two hours that it took the group to load the van, Casale and Federico were in the area of the street; were frequently standing in and going in and out of the door-

ways of both No. 18 and No. 20 Stillman Street; and were in the way some of the time. The entrance doorway was rather narrow. Federico sometimes blocked the path of the people carrying the boxes and sometimes spat on the sidewalk. Casale also spat on the sidewalk and in front of Theologus. For about ten minutes Casale and Federico swore at Theologus.

At one point Russo heard Federico say to Theologus, "Do you want to fight?" Theologus responded, "No," and Russo said, "Please let us finish packing and leave here in peace." Hackler recalled that Federico said something like, "You guys think you're tough. You want to fight?" At one time Federico asked Theologus if he wanted to fight and Theologus said, "Not necessarily."

At approximately 11:30 A.M. Casale and Federico had a conversation in the doorway of No. 18 Stillman Street. Federico, who lived on the second floor of No. 20 Stillman Street, then went into that building. Casale went in the direction of North Station. Casale was later seen returning with Bruno and two other, unidentified persons and the four of them moved, two by two, in "a strong steady march," faster than a normal walk, toward Stillman Street. As they reached the corner of Stillman and North Margin Streets, Federico quickly came out of No. 20, went around behind the van and joined the group which then passed along the side of the van.

At this time, Hackler was in between the open back doors of the van; Monforte was in the rear helping to load; McFarlane was on the sidewalk near the entrance to 20 Stillman Street; Theologus was at the right hand side of the van; and Russo was upstairs. The group of five, which included Casale, Federico, and Bruno, hesitated in front of the van and then went into the playground across the street. Monforte moved to the left of the van to check the tires and see that nothing was wrong and McFarlane moved along the other side of the van. About ten seconds later, during which McFarlane had walked the length of the van and turned in front of it, and the other group had entered the

playground, five shots were heard from the playground area. Hackler, who was then inside the van heard the shots, jumped out, and saw McFarlane fall against the front fender of the van and then to the ground. As he was falling, McFarlane said, "They got me. They got me."

Monforte ran after Casale, who was running in the playground, and Theologus ran after him, trying to get him back "so he wouldn't get shot."

While standing in the doorway between the living room and kitchen of her fifth floor apartment, Russo heard five loud noises and looked out the kitchen window and then out the side window of the living room. She had an unobstructed view of the playground. At about noontime on this sunny day she saw three persons in the playground: Casale and Bruno were running and Federico, whom she recognized from the back of his hair and his jacket, was standing near an opening in the playground fence. She then ran downstairs and saw McFarlane lying on the sidewalk bleeding. When she first saw Monforte and Theologus after hearing the noises, they were in the playground running after Casale and Bruno.

Russo had come down from the apartment to the street a number of times during that morning and had not seen any persons in the area other than Casale and Federico. The movers did not see any persons, other than those five described above, in the area at the time of the shooting.

Officer Patti, who was on Thatcher Street in the North End that day, heard five shots at about 12:30 P.M., ran to the scene, and saw McFarlane lying on the sidewalk. Patti and one of the movers attempted to assist his breathing process but "the air was just coming out of the side where the holes were from the bullets." After getting no response, Patti instructed another officer to watch the body and he went to the playground area to search for a weapon. Patti observed bullet holes in McFarlane's chest and a bullet in the blood on the sidewalk when McFarlane's body was placed on a stretcher.

Another officer and a detective looked for evidence in the playground area and did not see a weapon of any kind. De-

tectives Joyce and Speranzo went to Stillman Street at about 12:30 P.M. that day, searched the area around the playground and then Joyce, other officers, and a sister of Federico went to a bowling alley on Front Street and found Bruno and Federico standing at a counter upstairs. Two other officers were on Prince Street in the course of responding to a call regarding the shooting when they noticed Casale running down the street, so they followed him. When they pulled alongside him he had stopped on the sidewalk; one officer spoke to him; and, as the officer started to get out of the car, Casale ran down Salem Street.

The medical examiner testified that McFarlane died as the result of a gunshot wound. An officer, assigned to the ballistics unit of the Boston police department, testified that a bullet he removed from a sign on Stillman Street had been fired from an opening in a chainlink fence near the playground area. The defendants stipulated that the bullet removed from the sign and that recovered from under McFarlane's body were fired from the same gun.

The defendants' motions for directed verdicts simply alleged that the Commonwealth had failed to introduce sufficient evidence to permit the jury to find each guilty beyond a reasonable doubt, and did not refer to either a charge of murder or of murder in the first or second degree. The judge treated the renewed motions, filed after the verdicts were returned, as challenging the sufficiency of the evidence as to so much of the indictments as charged murder in the second degree. The quantum of the Commonwealth's evidence remained undiminished at the end of the trial.

We treat the motions in the same manner and, therefore, review the evidence, under the *Latimore* standard, to determine whether that evidence and the permissible inferences warrant the verdicts of guilty of murder in the second degree. See *Commonwealth* v. *Richard,* 377 Mass. 64, 65-66 (1979); *Commonwealth* v. *Podlaski,* 377 Mass. 339, 343-344 (1979).

Murder in the second degree is an unlawful killing with malice aforethought; malice includes any intent to inflict in-

jury on another without legal excuse or palliation. *Commonwealth* v. *Hicks*, 356 Mass. 442, 444-445 (1969), citing *Commonwealth* v. *Bedrosian*, 247 Mass. 573, 576 (1924). A fatal blow purposefully and wrongfully inflicted and not the product of chance or the frailty of human nature is malicious and murderous. *Commonwealth* v. *Hodge* (*No. 2*), 380 Mass. 858, 865 (1980).

We have recently cited with approval the statement appearing in *Commonwealth* v. *Chance*, 174 Mass. 245, 252 (1899), that "it is possible to commit murder without any actual intent to kill or to do grievous bodily harm," for "malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act." *Commonwealth* v. *Scanlon*, 373 Mass. 11, 18 (1977).

After considering the pattern of harassment of the movers; the fact that the defendants conversed before separating; and the reunion of the defendants who, along with three others, then walked along the side of the van and into the playground area from which the shots were fired, the jury could have inferred that the shots were the product of an intent to inflict injury without excuse and were fired with the knowledge that there was a stong likelihood that someone would be killed. Thus, the evidence was sufficient to permit the jury to infer the existence of the essential elements of murder in the second degree. The first segment of the *Latimore* standard is, therefore, satisfied.

We now consider whether the evidence and permissible inferences were sufficient to bring minds of ordinary intelligence and sagacity to the persuasion of guilt beyond a reasonable doubt. In the circumstances of this case, the concept of joint enterprise is inextricably intertwined with the issue of culpability for murder in the second degree. The trial judge stated in his "Memorandum of Decision on Defendants' Motion for a Directed Verdict" that the Commonwealth's case was entirely predicated on the jury's finding the existence of a joint enterprise. We agree.

"[O]ne who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal"; and the jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense. See *Commonwealth* v. *Soares*, 377 Mass. 461, 470 (1979). However, mere presence at the scene is not sufficient to support a conviction. *Commonwealth* v. *Whitehead*, 379 Mass. 640, 651 (1980); *Commonwealth* v. *Funches*, 379 Mass. 283, 295 (1979). Indeed, presence with knowledge of the planned act is insufficient alone to be the basis of a conviction of a person for the acts of another. *Commonwealth* v. *Soares, supra* at 471. Nevertheless, if one is, by agreement, in a position to render aid he is an abettor even if he does not participate in the actual perpetration of the crime because his presence may encourage the perpetrator by giving him hope of immediate assistance. *Id.* at 471-472, citing *Commonwealth* v. *Knapp*, 9 Pick. 495, 518 (1830).

Casale and Federico were present in the area from which the shots were fired and were in a position to render aid to the person who did the shooting. Therefore, we must now focus on the matter of knowledge or intent.

A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial. *Commonwealth* v. *Sandler*, 368 Mass. 729, 741 (1975). *Commonwealth* v. *Holiday*, 349 Mass. 126, 128 (1965), and cases cited. The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable. See *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). In *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974), we stated that "[t]he probability that the defendant had 'knowledge' could be brought home to the defendant 'circumstantially' or inferentially, just as other elements leading to a finding of guilty complicity could be."

The jury reasonably could have inferred the requisite mental state from the circumstances and from the conduct of the defendants. The judge did not err in submitting the issue of joint enterprise to the jury.

Casale and Federico suggest in their joint brief that the jury could have drawn the following inferences against them: that they harbored hostility towards the movers; that their conduct was intended to provoke a physical confrontation; that Casale went to get help; that Federico would join the group; that both intentionally remained with the group as it passed the van and entered the playground; and that both were with or near the group when the shots were fired.

After appraising the evidence we have concluded that the jury could also have drawn the additional reasonable inferences: that an understanding had been reached between the defendants to perform the acts that followed their conversation; that the attack would be accomplished from the playground area if no struggle erupted as the group passed the van; that each intended to be of assistance (by providing or helping to obtain the gun, by helping with the planning, by doing or encouraging the shooting, or by acting as a lookout); that the opening in the fence where Russo saw Federico standing is the one from which the shots were fired; and that the extended flight of each defendant indicated consciousness of guilt rather than fear for personal safety.

The second segment of the *Latimore* standard is therefore satisfied although the Commonwealth did not prove that either defendant possessed a gun or committed the murder by his own hand. Direct evidence of those facts is not required where, as here, there is strong circumstantial evidence that one of the defendants shot McFarlane. See *Commonwealth* v. *Stirling*, 351 Mass. 68, 76 (1966). Furthermore, the Commonwealth need not have established which one of the group fired the shots. See *Commonwealth* v. *Britt*, 358 Mass. 767, 769 (1971).

We consider the essence of the factual pattern at issue to be distinguishable from that of such cases as *Commonwealth* v. *Clark*, 363 Mass. 467 (1973), upon which the defendants

rely. In the *Clark* case this court stated that it could not conclude that in the joint effort of selling heroin to two persons it could have been contemplated by Clark that the death or injury of one of the potential purchasers was in aid of the plan; that there was no evidence that Clark took any action from which the jury could have inferred such an intent; and that there was nothing to show that Clark had known of his companion's possession of a gun or of his intent to use it. *Id.* at 473. In contrast, the evidence in this case suggests the existence of a continuing effort by both defendants physically to harm the movers. Moreover, the shooting of McFarlane was not an outgrowth of a separate and distinct event such as an attempt to sell heroin.

In addition, it is appropriate to indicate that the case is distinguishable from that of *Commonwealth* v. *Fancy*, 349 Mass. 196 (1965). Fancy arrived at a café with four others, also defendants, and was later arrested at an apartment where some of the stolen goods were found. *Id.* at 200. The court stated that although it could have been inferred that Fancy associated with persons who committed the larceny, this did not justify the inference that, in the intervening period, Fancy had participated in the crime. *Id.* A contrary holding would be tantamount to introducing into our law a doctrine of guilt by association. *Id.* Here, Casale and Federico not only engaged in harassing the movers prior to the shooting and fled from the area immediately after the incident, but they also were present in the playground area when the shots were fired from that location.

The defendants also contend that the judge erred because the Commonwealth allegedly failed to exclude every other hypothesis to the effect that a person or persons other than the defendants committed the offense. The Commonwealth was not required to do so in order to avoid directed verdicts against it for, as was stated in *Commonwealth* v. *Montecalvo*, 367 Mass. 46 (1975), it is not necessary to prove that no one other than the accused could have performed the act. That another might have had such an opportunity goes only

to the weight of the evidence, which is a matter for the jury. *Id.* at 55-56, and cases cited.

We now turn to the question of relief under G. L. c. 278, § 33E. Notwithstanding the defendants' failure to brief the subject, we have reviewed the whole case, with consideration of both the law and the evidence, and we conclude that the defendants are entitled to no relief under G. L. c. 278, § 33E. Although this statute in its present form (see statute as amended by St. 1979, c. 346, § 2) requires review thereunder only as to convictions for murder in the first degree, we note that the defendants' convictions for murder in the second degree are for offenses which occurred on November 6, 1977, on which date the statute required review of convictions of murder in either the first or second degree if they resulted from an indictment for murder in the first degree. *Commonwealth* v. *Davis,* 380 Mass. 1, 12-17 (1980).

We reiterate our earlier stated expectation that briefs in all capital cases brought before us will contain appropriate arguments addressed to our review under § 33E. See *Commonwealth* v. *Brown,* 376 Mass. 156, 168 (1978).

The judgments of conviction are affirmed.

*So ordered.*