COMMONWEALTH *vs*. PAUL A. LONGO
(and two companion cases[1]).

Suffolk.   October 17, 1986. — February 20, 1987.

Present: WARNER, KAPLAN, & FINE, JJ.

*Assault and Battery.   Joint Enterprise.   Practice, Criminal,* Required find-
    ing.

Three defendants tried together on murder indictments were entitled to re-
    quired findings of not guilty on these and all lesser included charges at
    the close of the prosecutor's case-in-chief where the evidence at that
    point tended to prove, at the most, that the defendants had been present
    at the time and place of the victim's stabbing by a fourth individual and
    that they bore hostility to the victim, and where the prosecution had
    introduced no evidence that the three defendants had agreed to lend their
    aid in the perpetration of the crime. [523-526]
Where murder indictments had been tried entirely on the theory that the three
    defendants were joint venturers in the stabbing of the victim by a fourth
    individual, and the jury returned verdicts of guilty of assault and battery
    which could not be sustained on this theory, the verdicts could not be
    allowed to stand on the basis of either the defendants' acts as joint
    venturers in moving the victim after the attack or their acts as individuals
    in doing so. [526-527]

INDICTMENTS found and returned in the Superior Court De-
partment on June 8, 1984.

The cases were tried before *Elbert Tuttle,* J.

*William P. Homans, Jr.,* for Paul A. Longo.

*Thomas C. Horgan* for Richard D. Garthe, Jr.

*Anthony M. Fredella* for Timothy Sullivan.

*Jane A. Donohue,* Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J. In connection with the violent death of Edward
Mullan, five men, Paul A. Longo, Richard D. Garthe, Jr.,

---

[1] Commonwealth *vs*. Richard D. Garthe, Jr., and Commonwealth *vs*.
Timothy Sullivan.

Timothy Sullivan, Randolph Roderick, and Steven R. Harris, were indicted for murder, and a sixth, Stephen Sullivan, with being an accessory after the fact. The cases of Randolph Roderick and Stephen Sullivan were severed from the rest. The other four were convicted, after joint trial, of the lesser included offense of assault and battery, and severally sentenced to two and one-half years' imprisonment at Billerica house of correction. Steven Harris has not appealed his conviction. Longo, Garthe, and Timothy Sullivan pursue their appeals, claiming error in the judge's denial of their motions for required findings of not guilty made at the close of the Commonwealth's case, and again at the close of the entire case. There have been other claims of error.[2] We hold that the motions made at the close of the Commonwealth's case should have been allowed, and accordingly we reverse.

1. We state in some detail what was brought out in the case-in-chief.[3] The Commonwealth's principal witness was David John Charles, who, at the time of the criminal event, had been bunking for two weeks with the Harris family (Harris, his wife Debra, and their two children) and Stephen Sullivan in a ground floor apartment at 40 Jones Road, Revere. The adults were in the parlor when about 11:00 P.M., April 7, 1984, the appellants (defendants) Garthe, Longo, and Timothy Sullivan dropped in. Perhaps a half hour later, Randolph Roderick arrived. During the course of the night there was heavy drinking (Charles, however, said he had only two beers) suffused with the smell of marihuana. Roderick left the parlor one or more times to snort cocaine, which he carried in tinfoil.

Around midnight, Edward Mullan, who had an apartment on the third floor, joined the party, accompanied by a number

---

[2] It becomes unnecessary to deal with the defendants' contention that the evidence before the grand jury was insufficient to support the indictments, and nothing turns on their contention that evidence at trial about the defendants' removal of the victim from the place of stabbing could not be received for any purpose other than to show consciousness of guilt.

[3] Only the case in chief need be considered. See *Commonwealth* v. *Soares,* 377 Mass. 461, 464 (1979); *Commonwealth* v. *Burrell,* 389 Mass. 804, 805 (1983); *Commonwealth* v. *Washington,* 15 Mass. App. Ct. 378, 381 (1983).

of his friends. They stayed for an hour or so. At one point, Harris and Mullan had a private meeting, from which they emerged amicably. However, Mullan showed displeasure at the way Longo was approaching Mullan's sister and girlfriend and said he would "stick his [Longo's] head up his ass." There was a scuffle between the two; Harris and others separated them. The Mullan party returned to the third-floor apartment.

Longo, wanting to know what Mullan's "problem" was, started up the stairs of the building with Timothy Sullivan and Charles following. Evidently Longo reached Mullan's door. Turning, he ran down the stairs with Mullan and a few of Mullan's friends in pursuit. As Longo reached the ground floor common hallway, Mullan fell upon him and a ten-minute struggle followed between them, brutal on both sides. Mullan and others returned to the third floor, Longo and others to the parlor. Garthe, a friend of Longo, was angered by Mullan's having gouged and bloodied Longo's eye and said he would get even with Mullan.

Some twenty minutes after the fight, Mullan and his party left the building. Harris, Garthe, Longo, Timothy Sullivan, and Charles (but not Roderick) mounted the stairs. Charles said he remained on the second floor landing while the others went on. They invaded Mullan's apartment and some or all of them did much damage to the furnishings. When the raiding party returned to Harris's parlor, Garthe was joking about having broken a door by butting it with his head.

Harris telephoned Mullan's brother, John, from the parlor and Charles heard him say that he had trashed Eddie's apartment and Eddie was next. About this time Roderick left the apartment and went to his car parked outside No. 40. Charles through a parlor window saw Roderick take a knife from the car. Roderick returned to the parlor carrying the knife, with a seven-inch blade, in his right hand. He placed the knife on the television set. Shortly, Roderick took up the knife, left the parlor, and evidently went into the adjacent bedroom.[4] Charles heard a car

---

[4] The layout, as we reconstruct it, becomes useful in the narrative. No. 40 Jones Road is a three-story, six-apartment building. A visitor coming

pull up in front of the building. He went to the kitchen for a drink of water. Standing at the sink, he heard Harris, in the interior hall, saying, "If you want to leave, you got to go through me." As Charles entered the hall from the kitchen, he saw Mullan doubled over. Roderick, facing Mullan, stabbed Mullan with a knife. Charles heard Mullan say he had enough, he gave up. Mullan fell on his side, his upper body in the parlor, the lower in the hall. At that point Harris was in the hall near Mullan's feet, Garthe stood in the parlor, near Mullan's head. Charles saw Roderick kicking Mullan in the face and yelling at him to get up; he heard Harris say that was enough, and Longo (from the parlor) say he's crazy, or the guy's crazy, or you guys are crazy. Charles, from his place in the hall, had seen Roderick stabbing Mullan but once,[5] and he saw only Harris, Roderick, and Garthe. Longo (whose voice he heard) and, presumably, Timothy Sullivan and Stephen Sullivan, were in the parlor, unobserved by Charles.

Charles, becoming physically ill, went toward the bathroom. Roderick rushed by Charles and attempted to pass his knife to him. Charles shrank from it. (Roderick was not seen again; he could have left the building through the kitchen.) Emerging from the bathroom, Charles saw Harris and Stephen Sullivan mopping up blood on the parlor floor. Harris asked Charles to help in the cleaning, and called him a wimp when he did not do so.

---

from the street walks up cement steps to the front door. Going inside, he stands in a hall-lobby area. At the far end of this hall from the front door is a staircase leading to the upper floors. (It is in this space near the staircase that the Mullan-Longo fight occurred.) On the left side of the hall is the door to Harris' apartment. Entering through the door, one stands in an interior hallway which is parallel and adjacent to the exterior hall. Across the hall from the door is a bathroom. From left to right, we have, first, a parlor, fronting on Jones Road; a bedroom; the bathroom mentioned; a kitchen, with a back exit out of the apartment and building; a bedroom. Part of the parlor can be seen by a person in the hall. The three windows in the parlor look out on Jones Road.

[5] In his testimony at the probable cause hearing and before the grand jury Charles denied seeing any stabbing. At trial he said he had been "scared" to testify to a stabbing.

Charles went to the street. Roderick's car was not there. Looking to his left, he saw Garthe, Longo, and Timothy Sullivan at a distance of twenty or thirty yards[6] carrying Mullan up Jones Road, two at Mullan's shoulders, the other at his feet. Charles crossed the street. A police cruiser came by. Terrified, Charles discarded a folding knife that he was carrying and ran to his right.

The Commonwealth called Mildred Rescigno who lived on the third floor of 44 Jones Road. At 4:13 A.M. (by her digital clock) she was wakened by what she took to be a man's scream. Looking out her window, she saw three men at the driveway two houses to her left, at No. 52. One of the three kicked something on the ground (the object was obscured from Rescigno by a bush) with a kind of karate kick. The men went toward a white car parked in front of the No. 52 driveway.[7] Later Rescigno was wakened by the arrival of police cars.

Phyllis Skelton, a waitress on a shift ending at 4:00 A.M., returning home with her boyfriend about 4:30 A.M., saw Mullan lying in the driveway. He was face up, motionless, had a chest wound and was bloodied all over. His shirt was up around his chest and his pants were down to his ankles.

There was testimony by two Revere police officers and a State trooper. Through the latter the Commonwealth introduced a sheaf of photographs of the scene and environs. A large pool of blood was found on the parlor floor at No. 40 and blood was spattered thereabout. Blood marks appeared on the landing and concrete stairs leading from No. 40 to the street, and along the way to No. 52.

Dr. Leonard Atkins, associate medical examiner for Suffolk County, testified about the results of the autopsy he performed at 9:15 A.M., April 8.[8] He said the cause of Mullan's death was a stab wound to the heart. There were some five additional stab wounds. Injuries to the head, particularly a laceration

---

[6] From No. 40 to No. 52 actually measured 160 feet.

[7] A car registration indicated that Longo owned a white Buick coupe.

[8] He noted that the body showed a blood alcohol level of .12 percent by weight, the equivalent of five ounces of straight whiskey consumed within forty to ninety minutes.

within the hairline, could have been caused by blunt force. The many abrasions were consistent with the body being dragged over rough surfaces in a course from No. 40 to No. 52. The reddish color of these injuries suggested that Mullan was alive when they were incurred; had he been dead a yellow color would be expected. It was possible, according to Atkins, that within a minute or two of suffering the fatal wound to the heart a man would be able to scream; but Atkins could not say whether this proposition was more probable than not.

A chemist of the State Crime Laboratory analyzed the stains at various places in the parlor and elsewhere. Numerous stains tested as human blood, of which the relatively few that were amenable to further testing fell to blood type A, Mullan's blood type. Traces on a mattress were of human blood that could not be typed. Traces, too, which could not be typed, appeared on the knob and label of a softball bat located between mattresses near a wall of the parlor. The traces were consistent with blood having spattered on the bat. A jackknife in a leather case was on Harris's belt when he was arrested in the morning of April 8. It tested free of blood. The interior of Roderick's car, examined on April 10, was stained with human blood, but typing failed.[9]

2. The Commonwealth has constructed a scenario to support its conception of criminal complicity on the part of the defendants. Thus: There was hostility between Longo and Mullan and, by extension, between Garthe and Mullan, with Garthe saying that he would even matters with Mullan. Further spite

---

[9] For completeness, we add Trooper Peter F. Coleman's testimony about his conversation with Harris, admitted only as to Harris. Harris said he had called John Mullan, the brother, around midnight and told him he had trashed Eddie's apartment and Eddie would be next. John said, "As long as it's a fair fight." When Mullan came home, Harris called him to his apartment and said he wanted Mullan to apologize to Debra. (This might be connected with the possible subject of the Harris-Mullan conversation during the Mullan party's visit to the Harris apartment.) Mullan said he had nothing to apologize for. Harris then pushed Mullan and said, "Why don't you fight me, I'm bigger than Paul." At that point, Roderick came from nowhere and stabbed Mullan. Harris said he told Garthe, Longo, and Timothy Sullivan to take Mullan to the hospital. Harris and Stephen Sullivan remained to mop up the parlor.

against Mullan was deliberately shown when Garthe, Longo, and Timothy Sullivan joined with Harris in breaching Mullan's apartment. Others besides Charles may have heard Harris say he would deal with Eddie next, and may have seen Roderick's knife in the parlor. It is possible that Mullan was lured into the Harris apartment as he entered the building. During the climactic moments, Harris barred Mullan's escape to the common hallway, while Charles, armed with his folding knife, cut off his escape through the back door of the kitchen (if he knew of the back door): the role of Charles (who was not charged) may have been less bland than he made it out to be. Roderick appeared and stabbed Mullan (evidently all six times). As Mullan fell, Garthe was nearby, and Longo, and presumably Timothy Sullivan, were in the parlor. The function of the three men was to lend aid to Roderick (or Harris and Roderick) if that should be needed. The outcry of Harris, and of Longo (from the parlor), can be taken as a protest against Roderick's using his shoe against Mullan rather than against the attack proper. Finally, the Commonwealth points to the defendants' moving Mullan, thus attempting to divert investigation. So runs the Commonwealth's scenario.

Reviewing the denial of a motion for a required finding of not guilty, "we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Campbell,* 378 Mass. 680, 686 (1979). The Commonwealth has the benefit of reasonable inferences, but is not to be indulged in inferences amounting to conjecture or surmise. See *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965). Thus we ought to discount such particulars of the proposed story as that Charles was acting to guard an exit, or that Mullan was deliberately lured to his doom. The paramount point, however, is that the story glosses over an absence of evidence on major elements of the case purported to be made against the defendants.

The Commonwealth's theory of prosecution was joint venture. This supposes that the defendants "intentionally assisted the principal in the commission of the crime and that [they] did this, sharing with the principal the mental state required for that crime." *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973). See *Commonwealth* v. *Funches,* 379 Mass. 283, 295 (1979); *Commonwealth* v. *Amaral,* 13 Mass. App. Ct. 238, 241-242 (1982); *Commonwealth* v. *Hennessey,* 17 Mass. App. Ct. 160, 162 (1983). The assistance may take the form of participation with the principal in the physical acts of which the crime is constituted, as in *Commonwealth* v. *Fidler, ante* 506 (1987). No such participation by these defendants is shown or can be claimed. What is pointed to is that the defendants were present in the vicinity of the killing (although two, Longo and Timothy Sullivan, may not have been in sight of it). Further, the defendants were hostile to the victim (although this is not clear in the case of Timothy Sullivan). From this follows the claim that the defendants were on hand to lend aid, if necessary, and thereby to furnish encouragement to the principal. But in that view it would be indispensable to conviction to show agreement between the principal and the defendants (which of course may be implicit rather than express) that the defendants would help the enterprise in that way. "[I]f one is, *by agreement,* in a position to render aid he is an abettor even if he does not participate in the actual perpetration of the crime because his presence may encourage the perpetrator by giving him hope of immediate assistance" (emphasis supplied). *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980). And to the same effect, requiring such agreement (a sharing of mental state, in the sense of the *Richards* case, *supra*), see *Commonwealth* v. *Perry,* 357 Mass. 149, 151 (1970); *Commonwealth* v. *Morrow,* 363 Mass. 601, 609 (1973); *Commonwealth* v. *Soares,* 377 Mass. 461, 471-472 (1979); *Commonwealth* v. *Bianco,* 388 Mass. 358, 366 (1983). There was no evidence here of such a compact.[10] What was shown was that

---

[10] It may be expected that inferences of agreement will generally be harder to draw in cases of "wanton, seemingly purposeless acts of destruction" or

the three men were at or near the scene when Roderick erupted with a knife.

We are to recall that a person cannot be held as a joint venturer by reason of being present at the commission of a crime and failing to do anything to prevent or stop it. See *Commonwealth* v. *Benders,* 361 Mass. 704, 708 (1972); *Commonwealth* v. *Clark,* 363 Mass. 467, 473 (1973); *Commonwealth* v. *Michel,* 367 Mass. 454, 457 (1975). This holds even if the person had prior knowledge of the plan to commit the crime. See *Commonwealth* v. *Soares,* 377 Mass. at 471; *Commonwealth* v. *Casale,* 381 Mass. at 173; *Commonwealth* v. *Amaral,* 13 Mass. App. Ct. at 241; *Commonwealth* v. *Pope,* 15 Mass. App. Ct. 505, 509 (1983). If there is added action by the person to conceal the crime after it has been committed, the conclusion is the same. See *Commonwealth* v. *Perry,* 357 Mass. at 151; *Commonwealth* v. *Murphy,* 1 Mass. App. Ct. 71, 77 (1973); *Commonwealth* v. *Amaral,* 13 Mass. App. Ct. at 241. So far do our courts wisely go to fend against "the ever present danger of assuming the complicity of all in attendance whenever group activity is involved." *United States* v. *Barber,* 429 F.2d 1394, 1397 (3d Cir. 1970). See *Commonwealth* v. *Fancy,* 349 Mass. at 200; *Commonwealth* v. *Chinn,* 6 Mass. App. Ct. 714, 717 (1978). The present case is well within this policy against "guilt by association."

3. These cases were tried, and the judge's instructions were concentrated, on a theory of joint venture applying to the stabbing in the hall of No. 40. As proof of such a joint venture fails entirely as to the three defendants, the cases crash, not only in respect to the charge of murder but the lesser included charge of assault and battery as well.[11] Contrast *Commonwealth*

---

"spontaneous and unpredictable acts of violence" than in cases of "armed robberies or other crimes characteristically marked by some degree of planning, preparation and purpose." Cf. *Commonwealth* v. *Drew,* 4 Mass. App. Ct. 30, 32 (1976).

[11] The verdicts below may have come about by the jury believing (erroneously) that there was a joint venture regarding the incident in the hall, but confined to assault and battery because the defendants were unaware that Roderick had or would use a knife.

v. *Washington,* 15 Mass. App. Ct. 378, 383-384 (1983), and *Commonwealth* v. *Hennessey,* 17 Mass. App. Ct. at 165, where the evidence supported joint venture as to one crime although not as to another, and conviction of the one crime could stand. Of course it cannot avail the Commonwealth in the present case that the defendants might conceivably have been proved guilty of being accessories after the fact. That crime was not charged. Nor can the Commonwealth urge that the assault and battery verdicts may be upheld on the basis of a joint venture limited to the acts of carrying Mullan from No. 40 to No. 52, for, as indicated, the cases were not tried, nor did the judge instruct, on that theme. For like reasons, the assault and battery verdicts may not be upheld on the basis of any acts of the defendants as individuals (not as joint venturers) in moving Mullan. To uphold the verdicts at the level of appeal on a basis not in the minds of the contending parties, the judge, or the jury below would be manifestly unjust and unlawful. See the analysis in *Cola* v. *Reardon,* 787 F.2d 681, 696-697 (1st Cir. 1986).

> *Judgments reversed.*
>
> *Verdicts set aside.*
>
> *Judgments for the defendants.*