Commonwealth *v.* Rivera.

COMMONWEALTH *vs.* HECTOR L. RIVERA.

No. 94-P-1108.

Plymouth. January 11, 1996. - April 22, 1996.

Present: ARMSTRONG, KASS, & LENK, JJ.

*Controlled Substances. Joint Enterprise. Practice, Criminal,* Assistance of counsel. *Evidence,* Joint enterprise.

At the jury-waived trial of indictments for trafficking in more than 200 grams of cocaine and conspiracy to so traffic the evidence, taken as a whole, was sufficient to support the judge's finding beyond a reasonable doubt that the defendant participated in a joint venture to traffic in some 334 grams of cocaine stashed in a certain apartment. [310-313]

A criminal defendant did not demonstrate that he had received ineffective assistance of counsel at trial. [313-314]

INDICTMENTS found and returned in the Superior Court Department on February 6, 1989.

The cases were heard by *Suzanne V. DelVecchio,* J.

*Peter M. Onek,* Committee for Public Counsel Services, for the defendant.

*Mary E. Mullaney,* Assistant District Attorney, for the Commonwealth.

KASS, J. Over a period of four and one half months, Anthony Thomas, a State police officer, bought cocaine on eleven separate dates from a drug-dealing operation to which the defendant, Hector L. Rivera, was connected. On two occasions Rivera himself was the deliveryman, once selling a seven-gram unit and the other time two seven-gram units. He was also connected to four other sales through the use of his automobile or license plates registered to him. The issue in the appeal is whether there was sufficient evidence to link Rivera to a cocaine stash of 334 grams found by the police at 23 Mulberry Street, Brockton, during a "bust" of the drug ring on January 12, 1989. Rivera was found guilty by a

Superior Court judge sitting without a jury of trafficking in more than 200 grams of cocaine and conspiracy so to traffic.[1] G. L. c. 94C, §§ 32E(*b*), 40.

1. *Rivera's participation in a joint venture.* There was evidence that allowed the judge to find as follows. In the early stages of the investigation, Officer Thomas initiated his "buys" through John Orrico. The latter would place a telephone call to 583-7085, a telephone number traced to 32 Pine Street, Brockton, and, in fifteen or so minutes, delivery would be made at a specified location. The first six deliveries were made by Miguel "Mickey" Santiago or Pedro "Pani" Paniajua. In two instances, Pani used as the delivery vehicle a station wagon carrying a license plate registered to the defendant Rivera.[2] Thomas had begun buying through Orrico on August 29, 1988. On October 4, 1988, the date of the fifth purchase, the police placed 32 Pine Street under surveillance. They observed Pani leave that address, drive to a building at 23 Mulberry Street, Brockton, enter, leave, and then proceed to the arranged meeting place with Trooper Thomas, to whom Pani delivered cocaine. Later, the telephone number which had rung at 32 Pine Street, 583-7085, was switched to 40 Farrington Street, Brockton.

On October 26, 1988, the District Attorney obtained a warrant (later refreshed on seven consecutive dates) to tap the telephone line for 583-7085. The tap monitors disclosed that a call forward device on many occasions relayed incoming telephone calls to 588-9658, a number located at 23 Mulberry Street, in an apartment leased to Helen Palmer. From the electronic and physical surveillance, a pattern of doing business by Pani, Santiago, and the defendant began to emerge. They took calls from customers at 40 Farrington Street, picked up "product" from 23 Mulberry Street, and then made delivery at drop sites they arranged with buyers.

In December, 1988, Thomas began to call the 583-7085 number on his own motion — i.e., without the intervention of Orrico — and ratcheted his orders up to two seven-gram units. On January 10, 1989, Trooper Thomas broached to

---

[1]The conspiracy indictment was filed with Rivera's consent.

[2]Although the license plate was the same, 904RZS, the vehicle to which it was attached was not. The first time the plate was used, it was on a 1978 Pontiac station wagon. The second time, it was on a red 1983 Chevrolet station wagon.

Pani his desire to buy four ounces. Pani replied he would have to discuss that with his friend Guido. The discussion with Rivera that the police caught on wiretap later that day was between another member of the ring, Thomas Rodriguez, and Rivera. Rodriguez communicated to Rivera that Tony (Trooper Thomas) "wants four large pigeons." Rivera's response was, "No, I don't think so. No. Say no." Through previous telephone surveillance, Thomas had come to know that Hector Rivera, the defendant, used Guido and Luis as alternate names. Another interception that day catches Pani talking to "Joe" (Jose Santiago). Pani informs Joe that Tony wants to know the price for "four pants twenty-eight." Joe smells a "narco" and commands, "No no no forget it. Tell him fini. When he calls you, tell him no more its finished." The next day, January 11, 1989, Thomas, speaking directly with the defendant over the telephone, pressed his case for buying a larger quantity. The defendant declined to deal in larger quantities.

On January 12, 1989, the police made their moves. They arrested Paniajua on the street, and the defendant and Thomas Rodriguez at 40 Farrington Street. Their search of those premises, authorized by a warrant, turned up neither drugs nor paraphernalia. Their search of 23 Mulberry Street, at which they arrested Jose Santiago and Helen Palmer, was more fruitful: hidden in a hole in a closet, the police found a strongbox with 48 plastic bags of cocaine, each containing approximately seven grams. The police also searched what they understood to be Rivera's primary residence in Boston, 75 Rossiter Street. They found a key to a safe deposit box in a Boston bank and, after arming themselves with another search warrant, looked into that box. In it was cash identifiable by serial numbers as having been paid by Trooper Thomas in connection with his purchases of cocaine from Rivera and his associates.

Rivera concedes his role in the street sales but argues that it requires impermissible leaps of inference to tie him to the Mulberry Street stash. He did not live there. No papers or possessions of his were found there.[3] To be sure, there was evidence that he had fielded telephone calls from Mulberry Street but that was not inconsistent with his claimed role as a

---

[3]*Commonwealth* v. *Caterino*, 31 Mass. App. Ct. 685, 688 (1991) (no constructive possession when defendant's only links to the location at which drugs were seized were as follows: his automobiles were observed

low level or middle level part in the distribution machinery. The Commonwealth has not, however, pitched its case on constructive possession, as to the elements of which see *Commonwealth* v. *Brezinski*, 405 Mass. 401, 409-410 (1989).[4] Rather, the Commonwealth bases its case on Rivera's participation as a joint venturer in the operation.[5] As to that, we think the evidence was sufficient under the *Latimore* standard to support the judge's findings. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Taken as a whole, the evidence shows extensive cooperation by members of the ring. They shared order taking and delivery duties and they shared cars and license plates.[6] As indicated, Rivera was not walled

there, he was present at the time of the search and seizure, witness testimony that the defendant could be contacted by calling the location [where the defendant's girlfriend lived], and the defendant had, on his person, one lorazepam pill similar to those seized at the location). Compare *Commonwealth* v. *Lee*, 2 Mass. App. Ct. 700, 704 (1974) (defendant's papers, including mail addressed to the defendant at the address, and men's clothing found in the same apartment as the "stash" supported a finding of constructive possession); *Commonwealth* v. *Carmenatty*, 37 Mass. App. Ct. 908, 910 (1994). Contrast *Commonwealth* v. *Pursley*, 2 Mass. App. Ct. 910 (1975) (no constructive possession was found when the defendant's personal papers were found in the apartment, but were not addressed there, and the defendant had not been observed at the apartment for several months).

[4]See also *Commonwealth* v. *Garcia*, 409 Mass. 675, 686 (1991); *Commonwealth* v. *Caterino*, 31 Mass. App. Ct. 685, 687-688 (1991); *Commonwealth* v. *Carmenatty*, 37 Mass. App. Ct. 908, 909 (1994).

[5]*Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980) ("One who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal; and the jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense" [citation omitted]). See also *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 346 (1983) (defendant must know of the criminal enterprise, actively participate, and do something in furtherance of it); *Commonwealth* v. *Sabetti*, 411 Mass. 770, 779-780 (1992); *Commonwealth* v. *Carmenatty*, 37 Mass. App. Ct. 908, 909 (1994) (defendant must [1] be present at or near the crime scene; [2] intend to commit the crime of selling drugs or have knowledge that another intended so to do; and [3] have agreed to be willing and able to assist his coventurers in the criminal enterprise if needed).

[6]See, e.g., *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340-341 (1983) (evidence that defendant discussed the drugs with cohorts and transported the drugs supported finding of joint venture). Contrast *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 412 (1986) (defendant's actions of looking up and down street, as "look out," one time during drug transaction, not sufficient to show participation in joint venture).

off from Mulberry Street but in fact fielded business calls while there. Weight could be given by the trier of fact to the evidence that Rivera had authority to decide what the volume of sales would be to a customer,[7] and that Rivera was arrested at 40 Farrington Street, to which calls were made.[8] Even if Rivera did not know the precise size of the inventory concealed at Mulberry Street, he would necessarily understand that it was of a quantity sufficient to support the volume of traffic in which he and his confederates were involved. Further evidence of Rivera's connection with the Mulberry Street depot is that the cocaine in the stash was packaged in the same fashion and in the same seven-gram units as the drugs Rivera and his confederates sold to Trooper Thomas.[9] Rivera argues that it is too facile to assume that the stash at Mulberry Street was the source of the drugs that he was selling. He points to the circumstance that the purity of what he had sold assayed at a percentage greater than what had been found in the stash, whereas, he suggests, one would expect the reverse to be the case. The percentages are not that far apart,

[7]Rivera's apparent decision-making authority is particularly revealing in light of the corresponding penalties for sales of cocaine in particular quantities. The usual quantity sold at one time by Rivera and his cohorts was two seven-gram units, usually weighing less than fourteen grams. A sale of less than fourteen grams of cocaine carries a minimum one-year sentence. G. L. c. 94C, § 32A(*c*). A sale of more than fourteen grams carries a minimum mandatory sentence of three years. G. L. c. 94C, § 32E(*b*)(1).

[8]*Commonwealth* v. *Casale*, 381 Mass. 167, 173-174 (1980) (actual possession or use of gun used to commit murder not required in joint venture theory of prosecution; continuing efforts by both defendants to harm the victim, actual presence in vicinity of shooting, and murder was the essence of the agreement rather than an outgrowth of a distinct event; defendants participated in harassment of victim prior to shooting and were in the vicinity of location where shots fired from at the time of the shooting).

[9]*Commonwealth* v. *Pratt*, 407 Mass. 647, 652 (1990) (similar drugs and identical manner of packaging gave rise to inference of knowledge, and, in conjunction with large quantity of drugs found, to inference of intent to traffic). See also *Commonwealth* v. *James*, 30 Mass. App. Ct. 490, 495-497 (1991) (defendant's possession of similar drugs, similarly packaged linked him to seized drugs). Compare *Commonwealth* v. *Benitez*, 37 Mass. App. Ct. 722, 725 (1994) (defendant's possession of similarly packaged drugs insufficient to support intent to distribute charge where no other evidence linked defendant to "stash" and case not submitted on joint venture theory).

however[10]; no evidence had been adduced about standard margins of error in the measurement of concentration; and, indeed, the defense at trial did not argue the implication from the varying strengths of concentration that we are now asked to make.[11]

There was evidence from the State trooper who led the search at Mulberry Street that the bags of cocaine found there were consistent with the bags used in the street sales. Evidence that Rivera retained some of the cash bills passed to him by Trooper Thomas tended to prove further that Rivera was not a mere flunky in the drug ring. See *Commonwealth* v. *Lopez*, 31 Mass. App. Ct. 547, 551 (1991). We conclude that the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that Rivera collaborated with Mickey Santiago, Paniajua, Rodriguez, Jose Santiago, and Palmer to traffic in drugs in the quantity found at 23 Mulberry Street — between 330 grams and 336 grams — i.e., Rivera participated in the joint venture that used the Mulberry Street stash.

2. *Claim of ineffective assistance of counsel.* Appellate counsel takes trial counsel to task for not objecting to admission of the transcriptions of intercepted telephone conversations. In point of fact, trial counsel did attempt — albeit unsuccessfully — to suppress the wiretap transcriptions.[12] The judge fully considered the motion and denied it in a detailed and thoughtful memorandum and order. Rivera claims, however, that in moving to suppress, counsel failed to specify the manner in which the wiretapping exceeded the scope of the warrant. Yet counsel, in his memorandum in support of the mo-

---

[10]The stash powder read 69% concentration; the delivered cocaine bags read at 75%, 78%, and 85%.

[11]An equally reasonable inference to be drawn from the difference in purity between the cocaine found at 23 Mulberry Street and the cocaine sold to Trooper Thomas is that they were all "cut," or diluted with a cutting agent, in different batches.

[12]He objected to the interceptions as violating the Massachusetts wiretap statute, G. L. c. 272, § 99, that the applications for the wiretap warrants did not set forth facts sufficient to meet probable cause, that the wiretapping was not conducted in accordance with the warrants, that the wiretapping did not sufficiently minimize the intrusion into personal privacy required by art. 14 of the Massachusetts Declaration of Rights, and that the affidavits in support of the warrant applications did not establish that normal investigative techniques were tried and failed or would be futile if attempted.

tion to suppress, expressly attacked the manner in which the wiretapping had been conducted. To the extent that the judge did not address specifically the point about interceptions lasting beyond the time limits prescribed by the warrant, it does not appear that conversations involving persons not expressly named in the warrant lasted more than ninety seconds, especially allowing for conversation in Spanish, to which the limit did not necessarily apply.

Assuming that counsel had failed sufficiently to press the point, and that selective portions of the telephone records were subject to redaction, the failure to press for redaction, considering the marginal benefits to the defendant, was not serious incompetence that fell measurably below what might be expected from ordinarily fallible counsel, and did not cause the jettisoning of a substantial ground of defense. *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). *Commonwealth* v. *McGann*, 20 Mass. App. Ct. 59, 60-62 (1985).

*Judgment affirmed.*