COMMONWEALTH *vs.* TYRONE WYNN.

No. 95-P-1820.

Suffolk. November 13, 1996. - April 7, 1997.

Present: DREBEN, GREENBERG, & LAURENCE, JJ.

*Destruction of Property. Malicious Injury to Property. Malice.*

At the trial of an indictment alleging that the defendant "wilfully and maliciously" destroyed or injured the property of another, the evidence was sufficient for the jury to reasonably infer that the injurious acts of the defendant and his coventurers were malicious. [453-457]

INDICTMENT found and returned in the Superior Court Department on November 19, 1993.

The case was tried before *Christine M. McEvoy,* J.

*Nona E. Walker,* Committee for Public Counsel Services, for the defendant.

*Paul M. Treseler,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. Only one issue is pressed on this appeal: whether the trial judge should have allowed the defendant's motion, at the close of the Commonwealth's case, for a required finding of not guilty on an indictment charging that he "did wilfully and maliciously destroy or injure" the property of another, in violation of G. L. c. 266, § 127. The defendant concedes that the Commonwealth's evidence might have supported a charge of "wanton" destruction of property, which is also proscribed by § 127 but is not a lesser included offense of malicious destruction of property, *Commonwealth* v. *Schuchardt,* 408 Mass. 347, 351-352 (1990), and was not here charged. That evidence, the defendant claims, nonetheless failed to establish the essential element of "malice" for the offense actually charged, because it did not show, as it must, that the defendant's and his coventurers' conduct was "motivated by 'cruelty, hostility or revenge.' " *Commonwealth*

v. *Schuchardt*, 408 Mass. at 352, quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 443 (1983). We conclude, however, that the Commonwealth presented sufficient evidence to permit the jury reasonably to infer that the defendant possessed the requisite malicious mental state while present at the scene and participating with his coventurers in the destruction of property.

As is true in most instances where a specific mental state is an element of the crime charged, we must examine "all the facts and circumstances developed at the trial," *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980), particularly those bearing on "the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). As always on a required finding motion, we not only view that totality of the evidence, both direct and circumstantial, in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979); but we also evaluate the permissible inferences that the jury may draw therefrom, with respect to the elements of the crime charged, by whether they are reasonable and possible, not whether they are necessary or inescapable. *Commonwealth* v. *Casale*, 381 Mass. at 173. *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 304-305 (1992). We recognize that, since the line separating mere knowledge of an offense from culpable participation in it " 'is "often vague and uncertain[,] [i]t is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line." ' 'To the extent that conflicting inferences are possible from the evidence, "it is for the jury to determine where the truth lies." ' " *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988) (citations omitted). In particular, we are aware that the line between "wanton" destruction of property and "malicious" destruction of property "cannot be located exactly; an approximation must do." *Commonwealth* v. *Cimino*, 34 Mass. App. Ct. 925, 927 (1993).

Applying these principles to the entirety of the Commonwealth's evidence, we are persuaded that the jury rationally could conclude that the defendant's conduct was properly located on the "malice" side of that imprecise line. The pertinent evidence supporting that conclusion was as follows. On Veteran's Day, November 11, 1993, at approximately

9:30 A.M., the defendant and two cohorts appeared at the front door of 137 Tonawanda Street in the Dorchester section of Boston, a two-story Victorian structure where Angela Anderson, her five children, and her sister resided in the second-floor apartment. Seven or eight young children were playing in the apartment on the school holiday. The three men attempted to gain entrance by pressing the front buzzer and banging on the locked front door. Anderson's son, who had gone downstairs to see who was outside, had returned to the apartment to inform his mother that a stranger was at the door (he had been able to make out only the top of a man's head through the curtained glass window at the top of the wooden front door). Anderson went downstairs herself to determine who was at the door but also could see only an unidentifiable head through the glass.

As Anderson opened the front door slightly to get a better look at the visitor, the heavy door was suddenly pushed open, hurling her backwards, and the three men forced their way into the house. The defendant, who wore a bandanna across his face, and a taller man both brandished drawn handguns. The taller man shoved his gun into Anderson's face and loudly demanded that she "give me the money." She began screaming in fear. As she continued screaming, one of the men seized her by the chest, and the three intruders pushed and dragged her up the stairs to her second-floor apartment. Having heard the commotion, her son locked the apartment door, yelled to his aunt to call the police, and fled out a rear door as the three invaders reached the apartment door and began banging on it. Without asking Anderson whether she had a key, the taller man began kicking the glass pane in the middle of the door until his foot broke through it. The taller man then reached through the broken window to open the door from inside, and the three men rushed into the apartment. The children inside began screaming and crying and tried to hide in closets and the pantry. Anderson was temporarily left outside the door and continued screaming. One of the men went back for her and dragged her into the apartment by her neck.

The three men began running and rummaging through all the rooms of the apartment. At one point the defendant discovered Anderson's young daughter hiding in the pantry and put his gun to her head while she screamed in terror. At

about the same time one of his confederates, encountering a locked closet door, began kicking at it to break it down. His kicks shattered the door, creating a hole through which he peered and spotted a suitcase. He pulled the suitcase out of the closet, tore it open, and proceeded to empty it by throwing its contents (which turned out to be mostly clothes) around the room. One of the men also opened Anderson's purse and scattered what was contained in it at the entrance to the apartment. The defendant was later arrested with the ninety-four dollars in cash that had been in the purse. One of the men also grabbed a ring from a bureau top. As they were thus engaged in their looting, Anderson (whose continued screams could be heard outside the front door of the house) heard someone yell "police," and police officers came running up the stairs. The three men fled out the rear of the apartment and through the backyard. The defendant was the only one apprehended by the police, after he had jumped over the rear porch, onto a garage roof, off the roof, and into a nearby yard. In his pockets was discovered the bandanna he had worn as a mask, as well as the ninety-four dollars from Anderson's purse. He was positively identified by Anderson at the scene as one of the intruders.

In assessing whether a rational jury could find sufficient indicia of either "cruelty" or "hostility" on the part of the defendant and his confederates in the Commonwealth's scenario (we exclude consideration of the element of "revenge," which was not presented by the evidence), we are not unaware that the Commonwealth's case with respect to the requisite mental state must consist of "something more than a deliberate intent to do a wrong." *Commonwealth* v. *Hosman*, 257 Mass. 379, 384 (1926). (Such evidence would, however, establish the "wilfulness" element of the statutory violation, which the defendant does not contest. See *Commonwealth* v. *Schuchardt*, 408 Mass. at 352.) We also acknowledge that the incidental "destruction of property which accompanies even violent crime may not by that token alone qualify as . . . malicious." *Commonwealth* v. *Cimino*, 34 Mass. App. Ct. at 927. See, e.g., *Commonwealth* v. *Armand*, 411 Mass. 167, 170-171 (1991) (defendant's conviction for maliciously injuring a control arm and a door of an automobile reversed, because the damage was unintentional and merely ancillary to the defendant's and his three colleagues' principal goal of pulling

victims out of a car in order to beat them viciously, and it was unclear whether the defendant knew what was going to happen before it actually happened).

The property injury here, however, could be viewed by the jury as going well beyond the incidental or accidental. The purposive smashing of the apartment door and of the closet door without inquiring as to the availability of keys, combined with the rifling of the suitcase and the purse, the indiscriminate scattering of their contents and the general ferocity of the home invaders' conduct — as manifested by the physical assaults on Anderson and the point-blank aiming of handguns at her and her daughter's heads — bespeak gratuitous, excessive violence purposefully designed to intimidate and overpower. The property injury could thus be seen in context as not the adventitious by-product of a wholly discrete criminal enterprise, as in *Commonwealth* v. *Armand, supra,* but rather as the necessary and deliberate condition precedent to effectuating the invaders' goal of terrifying the residents in order to facilitate their robbery.

We are satisfied that a jury could reasonably find in the defendant's and his coventurers' conduct "[s]uch a spirit of hostility and ill will against the property and person of anyone, whoever he was, if he stood in the[ir] way or barred the[ir] progress . . . [as] was wilful and malicious." *Commonwealth* v. *Hosman,* 257 Mass. at 385. (The defendant does not challenge the Commonwealth's position at trial and here that the evidence demonstrated that he shared the culpable mental state of his accomplice who actually caused the property damage.) Moreover, the circumstances, particularly the physical violence, the flagrant use of handguns, and the emotional distress imposed on the apartment residents by the invasive turbulence, could be construed by a jury as "cruel" in both of its basic connotations: a "disposition to harm and satisfaction in or indifference to suffering." The American Heritage Dictionary 449 (3d ed. 1992).

The totality of the Commonwealth's evidence thus permitted a rational jury to induce that the injurious acts of the defendant and his coventurers were malicious in the required sense of reflecting "the additional element of . . . special depravity or special hostility." *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. at 441, quoting from *Commonwealth* v. *Goodwin,* 122 Mass. 19, 35 (1877). Such an induction would be in

accord with the ordinary intelligence and sagacity, *Commonwealth* v. *Casale*, 381 Mass. at 168, and experiential common sense, *Commonwealth* v. *Cordle*, 412 Mass. 172, 178 (1992), which we attribute to juries in drawing inferences, as well as with authority. See *Commonwealth* v. *Hosman*, 257 Mass. at 384 (sufficient malice demonstrated where the defendant ordered his agent to drive their car through a road block to avoid arrest); *Commonwealth* v. *McGovern*, 397 Mass. 863, 868 (1986) (sufficient malice shown where the defendant broke window of a parking lot booth, "knocked in" the door, and threw personal property out of the booth); *Commonwealth* v. *Walters*, 12 Mass. App. Ct. 389, 391-392 (1981) (Commonwealth established that defendant, intervening in fist fight, struck one of the combatants with a club, then used the club to smash the windshield of a truck in which that combatant had sought refuge; sufficiency of evidence to show malice not challenged); *Commonwealth* v. *Domingue*, 18 Mass. App. Ct. 987, 989-990 (1984) (sufficient malice demonstrated by defendant's firing handgun into bar in order to frighten bartender); *Commonwealth* v. *Cimino*, 34 Mass. App. Ct. at 927 (malice sufficiently established by proof of indiscriminate shooting of BB gun pellets through car windows at which defendant and his coventurers had aimed; in dictum, court noted that throwing rocks from a bridge would demonstrate malice if rocks were aimed at passing cars rather than casually dropped without thought of striking any cars).

*Judgment affirmed.*